WILL BLACKWELL AND ROBERT BLACKWELL, *Plaintiffs in Error,* v. THE STATE OF FLOIRDA, *Defendant in Error.*

## Opinion Filed May 10, 1920.

1   It is not indispensable that the jury, in a capital case, should be committed to the charge of a bailiff specially sworn for the occasion.  It is sufficient if they be put in charge of the Sheriff, or his deputy, who has taken the oath of office.

2.   Where in a criminal prosecution the evidence adduced does not clearly sustain a ground of a motion for new trial, asserting that counsel for the defendants were so intoxicated during the trial as to substantially deprive the defendants of their right to be properly represented by counsel, and the record discloses no lack of efficiency of the counsel, the motion on that ground is properly denied.

3.   A portion of a charge that "the fact of flight is a circumstance to be considered by the jury as tending to increase the probability of the defendant being the guilty person," being abstract, is harmless when coupled in the same paragraph with other statements of the law on the subject, and under all the circumstances of the case the defendants could not reasonably have been prejudiced by the quoted charge.

4.   It is not error to refuse to give instructions that have already been given substantially, though couched in different language.

5. In order to merit consideration by this Court assignments of error must be argued, unless the error complained of is so glaring or patent that no argument is needed to demonstrate it.

6. Where one of the assignments of error is based upon the overruling of the motion for a new trial, an appellate court will consider only such grounds of the motion as are argued.

7. Proper charges on the subject of "alibi" discussed.

8. Where a portion of a charge is abstract, and even if not entirely correct, it is manifestly harmless, it is not reversible error to refuse to give a more appropriate charge on the subject that is requested by the interested party.

9. Under the statute authorizing the use in a subsequent trial of the evidence incorporated in a bill of exceptions taken at a former trial, when the testimony of the same witness "cannot be had," at the subsequent trial, it is not error to admit such bill of exceptions when it is "made to appear to the satisfaction of the court" that the witnesses are sick and most probably could not appear to testify for more than two weeks, when the accused had met the witnesses against him face to face and was given full opportunity to examine them at the former trial when the bill of exceptions was taken.

10. Chapter 5897, Acts of 1909, authorizing the use at a subsequent trial of the evidence adduced and incorporated in a bill of exceptions at a former trial, where on the subsequent trial it is "made to appear to the satisfaction of the court" that the testimony of the same witnesses "cannot be had," is not in conflict with the organic provision that in all criminal prosecutions the accused shall have the right "to meet the witnesses against him face to face."

11. In criminal prosecutions the use of evidence adduced and incorporated in a bill of exceptions may, under Chapter 5897, Acts of 1909, be used as evidence in a subsequent trial, only when the accused had on the former trial met the particular witnesses against him face to face and had full opportunity

to cross-examine them and when it is "made to appear to the satisfaction of the court" that the witnesses "cannot be had" to testify in person at the subsequent trial.

12. Where there is ample competent evidence to sustain a verdict found and it does not appear that the jury were not governed by the evidence in making their finding, and no material or harmful errors of law or procedure appear in the record, a judgment of conviction will be affirmed.

A Writ of Error to the Circuit Court for Bay County; D. J. Jones, Judge.

Judgment affirmed.

*J. Ed Stokes,* for Plaintiffs in Error;

*Van C. Swearingen, Attorney General,* and *D. Stuart Gillis,* Assistant, for the State.

WILLS, Circuit Judge.—Will Blackwell and Robert Blackwell, brothers, were jointly indicted in Okaloosa County, Florida, in two separate indictments for the murder of M. M. Davis and his wife, Nancy Davis, and on May 7th, 1917, were put upon trial under the indictment charging them with the murder of Nancy Davis. During the course of the trial the defendant, Will Blackwell, escaped from custody, thereby necessitating an order of mistrial. After a lapse of about three weeks he was recaptured, and on July 2, 1917, the defendants were placed on trial for the murder of M. M. Davis, were convicted of murder in the first degree, and sentenced to death, the case then went to the Supreme Court on a writ of error and was reversed (See 76 Fla. 124, 79 South. Rep. 731) and a new trial awarded.

After the reversal of the case it was transferred to the Circuit Court of Bay County, Florida, where the defendants were again placed upon trial in the Circuit Court of Bay County, Florida, for the murder of M. M. Davis on the 17th day of December, A. D. 1918, and were again convicted of murder in the first degree and sentenced to death, and from this judgment defendants sue out writ of error.

Plaintiff in error contends in the second assignment of error that the court erred in permitting R. A. Rice to act as bailiff for the jury sworn to try the case without requiring him to take a special oath. The record discloses the fact that the said Rice was a regular appointed deputy sheriff and that when designated to act as bailiff to the jury was called up by the judge in the presence of the defendants and their counsel and admonished by the judge as to his duties while in charge of the jury. The record fails to show any improper conduct on the part of said Rice while in charge of said jury, nor is there any intimation by the defendants that there was, and even if it had been proper that he should have taken an additional oath to the one as deputy sheriff the failure to take such oath would be harmless error and no grounds for reversal.

But we do not concede that where a sheriff or deputy sheriff acts as bailiff that any additional oath is necessary. This court in the case of Cato, a Slave, v. State, 9 Fla. 163, said: "It is not indispensable that the jury, in a capital case, should be committed to the charge of a bailiff specially sworn for the occasion. It is sufficient if they be put in charge of the Sheriff, or his deputy, who has taken the oath of office."

Counsel in their brief cites the case of Nicholson v. State, 38 Fla. 99. Upon a careful reading of this case we find nothing in conflict with the authority above cited.

Another ground contained in the motion for new trial was that they (defendants) were not properly represented because their attorneys became intoxicated during the trial. The only evidence relied upon to maintain this ground is the affidavit of the two defendants, and there was a counter affidavit of eight or nine persons who were present in the court room throughout the trial denying the fact that the attorneys of the defendants were drunk during the trial, or under the influence of liquor. The judge who presided at the trial, and who had continual observation of said attorneys, after considering the affidavit presented at the time of the motion for new trial, overruled the motion for a new trial, which he certainly would have granted had he believed that the defendants had not had a fair and impartial trial by reason of the intoxication of their lawyers. There is certainly no evidence in the voluminous record brought here of any intoxication or lack of mental activities on the part of defendants' counsel during the trial.

The third assignment of error as given in the motion for new trial is as follows: "If you find that the defendants at or about the time the charge contained in the indictment was preferred against them fled to another place and that such flight was induced by the charge you may consider such flight in determining the guilt or innocence of the defendants. The flight is a circumstance to be considered by the jury as tending to increase the probability of the defendants being the guilty persons."

Counsel contend that such charge as complained of the natural assumption of the jury would be that it was

prima facie evidence of the guilt of the accused, and it might possibly be open to this criticism if that were the entire charge. The charge complained of as erroneous must not be determined on as to its correctness by segregated parts, but as a whole. The charge complained of in its entirety meets the contention of counsel against it. The charge, in words, was as follows:

"If you find that the defendants, at or about the time the charge contained in the indictment was preferred against them, fled to another place and that such flight was induced by the charge, you may consider such flight in determining the guilt or innocence of the defendants. The fact of flight as a circumstance to be considered by the jury as tending to increase the probability of the defendant being the guilty person. It does not give rise to a legal presumption may rebut any inference which may be drawn from such flight by proper testimony which may tend to explain the same."

The flight of a person accused of crime raises no presumption of guilt, but is a circumstance that goes to the jury to be considered by them with all the other testimony and circumstances and given such weight as the jury may determine it entitled to. The rule is that when a suspected person in any manner endeavors to escape or evade a threatened prosecution, by flight, concealment, resistance to a lawful arrest or other *ex post facto* indication of a desire to evade prosecution, such fact may be shown in evidence as one of a series of circumstances from which guilt may be inferred. Whart. Crim. Ev. (9th ed.), Section 750, and citations. Carr v. State, 45 Fla. 11, text 16.

The fourth and fifth assignments complain of the refusal of the judge to give charges upon circumstantial

evidence. From our view of this case the State relied not only upon circumstances, but upon alleged confessions, and it would not have been error for the judge to have failed or refused to have given any charge upon circumstantial evidence; but the judge did in the charge given upon his own motion fully and correctly give in charge law of circumstantial evidence and it was not error to refuse to give additional charges when the substance of such requested charges had already been given.

"It is not error to refuse to give instructions that have already been given substantially, though couched in different language." Higginbotham v. State, 42 Fla. 573.

The sixth assignment of error is that the court erred in refusing to give the following charge requested by the defendants:

"Gentlemen of the jury, this has been and is a very notorious case and there has been more or less excitement over it, and that feeling may possibly have crept into the trial to some extent, I am not saying that it has, but for fear that it has, and in an abundance of caution that nothing but justice may be done, I deem it my duty to instruct you and caution you against convicting the defendants or either of them through prejudice of witnesses who may have testified in this case; or upon insufficient evidence; to caution you that in your deliberations you should not be influenced one whit by what is commonly called public sentiment; nor should you be influenced by any act or actions of any officer or officers, if there be such act or acts, that appear to be hostile to the defendants or either of them. In other words, you must consider the evidence that has been given you on the witness stand, and that alone, in arriving at your verdict."

The Court of its own motion had given the following charge: "A fair and impartial trial is absolutely essentisal to the due and proper administration of justice, and it is of prime importance that this truth be constantly borne in mind, both by courts and juries. If the courts are to retain the respect and the confidence of the people and properly perform the important duties and exercise the great powers invested in them by the Constitution in accordance with its spirit and purpose and carry out and perform the objects of their creation, they must obey the constitutional command respecting fair and impartial trials and give to every case submitted to them for decision due, careful and conscientious consideration, basing their judgment upon sworn, legal and credible evidence, uninfluenced by other extraneous considerations. In the administration of justice juries are entrusted with functions of supreme importance. They consider and weigh the evidence submitted, determine the credibility of witnesses, and find from the evidence the facts upon which the court passes its judgment. In deliberating upon and endeavoring to reach a correct and conscientious verdict, the jurors are required by the law to be guided by the sworn evidence in the case to calmly and dispassionately weigh and consider it, uninfluenced by any impression or opinions respecting the guilt or innocence of the accused, and based entirely and exclusively upon such evidence."

This charge covers substantially the requested charge and there was no error in the refusal to give the same.

The seventh assignment of error is based upon the refusal of the judge to give the following charge: "I charge you that an accomplice is one who participates in the commission of a crime as aider or abettor; any person

who is connected with the commission of the crime charged, whether they directly committed the act constituting the offense or aided and abetted, counseled or assisted in planning its commission, and the law of this State is that the testimony of an accomplice should be received with great caution." ·

The judge of his own motion had given the following charge: "The State relies in part for a conviction upon the testimony of Will Boyd, an accomplice, and in part upon circumstantial evidence. You are instructed that an accomplice in crime is a competent witness against a co-perpetrator of the crime, and his evidence should be weighed by the jury, even though uncorroborated, and given such weight as the jury believes it entitled. If the testimony of an accomplice is corroborated by other testimony it should be entitled to greater weight than if uncorroborated. While the testimony of an accomplice should be received with caution, especially if uncorroborated, still it should not be rejected if not corroborated in every material statement, if the jury believe that it is entitled to any weight. The evidence of an accomplice should be received with caution, but you are the judges of the credibility of the evidence of the accomplice and you should give it such weight as you believe that it should have when taken and considered together with the whole evidence in the case." This charge covers in substance the requested charge, hence there was no error in refusal to give the charge asked.

Assignments numbers eight, nine, ten, eleven, twelve, not having been argued, under the established rules of this court, may be considered as abandoned.

An assignment of error not argued and. where a motion for new trial contains several grounds, only those argued will be considered.

"In order to merit consideration by this court assignments of error must be argued, unless the error complained of is so glaring or patent that no argument is needed to demonstrate it.

. "Where one of the assignments of error is based upon the overruling of the motion for a new trial, an appellate court will consider only such grounds of the motion as are argued." Lindsey v. State, 67 Fla. 111. See also Smith v. State, 65 Fla. 56; Revels v. State, 62 Fla. 83; Johnson v. State, 55 Fla. 41; Colson v. State, 51 Fla. 19.

This case involving human life we will depart from the usual custom and consider the eighth assignment of error based on the refusal of the court to give the requested charge on the defense of an alibi, which was as follows: "The defense of an alibi has been offered, which means that the defendant were not there when the crime charged was committed, and consequently did not do it. If from the evidence in this case you have a reasonable doubt as to the alibi, that is to say, whether the defendants were there or not, then you should give them the benefit of such reasonable doubt and find them not guilty."

The requested charge correctly stated the law of this case upon the question of the defense of an alibi; but if the requested charge was covered by other charges given, it would not be error to refuse it. The court of its own motion had instructed the jury as follows: "The defendants under their plea of not guilty set up as a defense what is known in law as an alibi. An alibi simply means that the accused were not present at the time and place of the commission of the crime, but were at another place and, therefore, it was impossible for them to have committed the crime. A defendant has the right to prove by

competent evidence that he was not present and could not have committed the crime, and if you believe from the evidence, or if you have a reasonable doubt from the evidence, that the defendants were not present at the time and place when M. M. Davis was killed, if you believe he was killed, then you must acquit them. The evidence of an alibi must cover the whole time when the presence of the accused were required. You must determine from the evidence whether the defendants proved that they were not there, or whether the evidence produced in your minds a reasonable doubt as to whether or not they were there. If, upon taking into consideration the evidence offered by the defendants to prove an alibi, with all the other testimony, you have a reasonable doubt as to whether or not they were there, you should find them not guilty. (The defense of an alibi is, of all other testimony, the most decisive when duly substantiated; but the evidence adduced in support of it requires to be minutely considered, and must be such as to render it impossible that the crime could have been committed by the party who claims that he was not present and could not be guilty as charged)."

The requested charge was fully covered by the charge given by the court in that part of the charge not included within the brackets, and that part of the charge was correct on the defense of an alibi, and the only criticism of the charge that could be made was by the addenda within the brackets. Was this sufficient to destroy the former part of the charge or mislead or confuse the jury . We quote from Words and Phrases. Vol. 1, p. 298:.

"The defense known in law as an 'alibi' is that, at the time of the commission of the crime charged in the indictment, the defendant was at a different place, so that

he could not have committed it. State v. McGarry, 83 N. W. 718, 719, 111 Iowa 709; State v. McGinnis, 59 S. W. 83, 88, 158 Mo. 105; State v. Hale, 56 S. W. 881, 882, 156 Mo. 102; State v. Taylor, 24 S. W. 449, 451, 118 Mo. 153; Commonwealth v. Webster, 59. Mass. (5 Cush.) 295, 319, 52 Am. Dec. 711; Savage v. State, 18 Fla. 970, 974; People v. Levine, 24 Pac. 631, 632, 85 Cal. 39; Wisdom v. People, 1 Colo. 170, 174, 17 Pac. 519, 522; Dunn v. State, 94 N. W. 646, 648, 118, Wis. 82."

"An 'alibi' in law simply means that the defendant was not there; or, to state it more definitely, a defendant who sets up an alibi shows such a state of facts surrounding his whereabouts at that particular time as would make it practically improbable or impossible for him to have committed the offense charged. State v. Child, 20 Pac. 275, 276, 40 Kan. 482."

We cannot commend as a model for clearness on the defense of an alibi the charge as given and think it would have been better to have omitted the part enclosed in brackets. The judge after correctly charging upon the defense of an alibi by the words enclosed in brackets charged an abstract proposition of law—the definition of an alibi—and we cannot say that it was so misleading or confusing to the jury as to constitute reversible error on the judge refusing the requested charge.

The thirteenth and fourteenth assignments of error are based upon the admission in evidence of the testimony in bill of exceptions of Harrison Davis and Saphronia Holmes as given at the former trial of this case upon the grounds that no sufficient predicate was laid for the introduction of such testimony. Dr. Porter Webb, a practicing physician, testified that Harrison Davis was prostrate in bed, due to inflammatory rheumatism, and that

it might last indefinitely and make him an invalid; that Saphronia Holmes was sick and "not able to come to court, and that if she had good luck it might be two weeks at least before she could get there." The Doctor upon being asked by the court, "Do you think either of them will be able to get here in the next two weeks," answered, "Oh, no; I don't think so, Judge."

From the testimony of these absent witnesses as contained in the bill of exceptions these witnesses had been at the former trial cross-examined at great length, and as further shown by the record in this case there were a great number of witnesses, both for the State and the defense, present at the time the case was called for trial and the defendant not showing or offering to show any further cross-examination of such witnesses. Under these circumstancmes we can not say that there was any abuse of judicial discretion in permitting the admission of such testimony, and an appellate court will not reverse the discretion of the trial judge unless there is a manifest abuse of such discretion.

There is some diversity of opinion among the courts as to whether temporary absence by reason of illness of a witness will permit the use of his testimony given at a former trial, but we think that the weight of authority and the better rule is that it is a matter resting in the sound judicial discretion of the trial judge.

"Any physical incapacity preventing attendance in court, except at the risk of serious pain or danger to the witness, should be a sufficient cause of unavailability; and this has been almost universally recognized by courts. Certain distinctions, however, have from time to time received special notice. (a) The *duration* of the illness need only be in probability such that, with regard to the

importance of the testimony, the trial cannot be postponed, (b) as to the *degree* of the illness, the traditional phrase, 'so ill as not to be able to travel,' sufficiently indicates the requirements of common sense; and the 'ability' is to be considered with reference to the risk of pain or danger to the witness. That the illness should be such as to make it impracticable to take the witness' deposition at his home has been said by one court to be the correct limitation; but this is certainly incorrect, for a deposition obtained from a person during illness could not be any better than his former cross-examined testimony or deposition, and would probably be much less trust-worthy. There is no reason why the application of the general principle in a given instance should ever come before a Court of Appeals; to the trial court should be left the determination of the existence of the necessity in a particular case." 2 Wigmore on Ev. p. 1760 §1406, and notes.

"MITCHELL, J., in Thornton v. Britton, 144 Pa. 130, 22 Atl. 1048: 'The determination of this question in each case as it arises rests largely in the discretion of the court. On a trial for murder, for instance, the judge presiding would feel it his duty to enforce the attendance of a witness having knowledge of the crucial facts, even at some risk to the witness' health or life; while in a civil action he might feel free to hold that a much smaller risk to the witness would be sufficient to excuse him from personal attendance." 2 Wigmore on Evidence, § 1406, and note.

"It is obvious that the purpose of this Act is to permit the introduction in evidence of a bill of exceptions containing evidence adduced at a former trial, upon the reversal of a judgment rendered thereat, when certain evi-

dence given at such former trial cannot be had. In other words, provision was made for the admission of the bill of exceptions when the testimony of a witness who had testified at a former trial could not be had by reason of the death, sickness or insanity of such witness or by reason of the fact that he is out of the jurisdiction or cannot be found after diligent search. See the discussion in Putnal v. State, 56 Fla. 86, 47 South. Rep. 864." Bennett v. State, 68 Fla. 494, text 498, 67 South. Rep. 125.

In the case of Putnal v. State, 56 Fla. 86, in the body of the opinion page 96 SHACKLEFORD, C. J., said: "Obviously, it is for the trial court to pass upon and determine whether or not a sufficient and proper predicate has been laid for the introduction of such former testimony. In the case at bar the trial court was of the opinion that such predicate had been laid, and, upon the showing made to us, we do not feel called upon to disturb the ruling. We fully appreciate the necessity of requiring a compliance with the rule in such cases and have no disposition or inclination for a relaxation of any of the safeguards that have been thrown around it."

In the earlier days the testimony of a witness given at a former trial was confined to cases where the witness was dead or had become insane, or beyond the seas or the jurisdiction of the court, but the tendency of the modern decisions has been to enlarge the rule of evidence as to the admission of such testimony. Prior to 1893, Chapter 4135 Laws of Florida, the testimony contained in the bill of exceptions was not admissible in evidence but such testimony had to be proved by some one who was present at the trial and heard the witness testify; but by Section 1 of Chapter 5897, Laws of 1909.

is as follows: "In case any judgment at law rendered by any court of the State of Florida shall be reversed and a new trial awarded, and it be made to appear to the' satisfaction of the court that any evidence used at the former trial, whether oral or written, and incorporated in the bill of exceptions, cannot be had, 'then the bill of exceptions taken at the previous trial may be used as evidence upon any subsequent trial of the case, as to any matter in issue at the former trial; Provided, that no evidence given upon a former trial of any case pending in any of the courts of the State of Florida shall be used in evidence upon the trial of any cause in any of the courts in the State of Florida, except as herein provided."

Other States have adopted statutes upon this subject, but those that we have had access to have defined under what conditions such as absence from the State, permanent illness, death or insanity, and we have been unable to find any statute similar to ours which permits the introduction of such evidence used at the former trial when it is "made to appear that it cannot be had." It seems from the broad language used that the legislative intent was to vest in the trial judge, a discretion under the circumstances of each particular case as to the admission or rejection of such former testimony contained in the bill of exceptions.

Ordinarily the court will not pass on the constitutionality of a statute unless the statute is expressly attacked as unconstitutional, but as there has been some discussion whether or not the objection to the admission of so much of the bill of exceptions as contained the testimony of the absent witnesses given at a former trial did not necessitate the passing upon the constitutionality of

Chapter 5897, Laws of Florida, 1909, which is as follows: "In case any judgment at law rendered by any court of the State of Florida shall be reversed and a new trial awarded, and it be made to apepar to the satisfaction of the court that any evidence used at the former trial, whether oral or written, and incorporated in the bill of exceptions, cannot be had, then the bill of exceptions taken at the previous trial may be used as evidence upon any subsequent trial of the case, as to any matter in issue at the former trial; Provided, That no evidence given upon a former trial of any case pending in any of the courts of the State of Florida shall be used in evidence upon a trial of any cause in any of the courts in the State of Florida, except as herein provided."

The writer of this opinion prior to the enactment of the amendment to this statute as a Trial Judge admitted over objection of the defendant testimony of a deceased witness, the chief witness for the State, taken upon a habeas corpus proceeding where the defendants charged with murder were represented by counsel and cross-examined this State witness. There was a conviction of manslaughter and upon appeal to this court the admission of such testimony was assigned as error, but not passed upon as the record of the case (not in the opinion) shows that it was not argued and was considered as abandoned. Bexley v. State, 59 Fla. 6, 51 South. Rep. 278.

"Because of the universal constitutional right of the accused to be confronted by the witnesses, it is absolutely necessary, in order that the testimony of a deceased or absent witness may be admissible at a subsequent trial against the accused, that the party against whom it is

offered should have had an opportunity of cross-examining him at the earlier trial.

"If the accused has *once* enjoyed his right to confront witnesses his constitutional right to meet the witnesses against him face to face is not violated by the admission of the testimony of such a witness, who is absent, at a subsequent trial. Hence, if the defendant was represented by counsel at the preliminary examination and has had an opportunity of cross-examining the witnesses, he has enjoyed his right to meet his accusers face to face, and no objection exists to receiving the testimony of deceased or insane witnesses." Underhill on Criminal Evidence (2nd ed.) §265.

"In the United States, most of the Constitutions have given a permanent sanction to the principle of confrontation, by provisions requiring that in criminal cases the accused shall be 'confronted with the witness against him' or 'brought face to face' with them. The question thus arises whether these constitutional provisions affect the common-law requirement of confrontation, otherwise than by putting it beyond the possibility of abolition by an ordinary legislative body. The only opening for argument lies in the circumstance that these brief provisions are unconditional and absolute in form *i. e.* they do not say that the accused shall be confronted 'except when the witness is deceased, ill, out of the jurisdiction, or otherwise unavailable,' but imperatively prescribe that he 'shall be confronted.' Upon this feature the argument has many times been founded that, although the accused has had the fullest benefit of cross-examining a witness now deceased or otherwise unavailable, nevertheless, the witness' presence before the tribunal being constitutional-

ly indispensable, his decease or the like is no excuse for dispensing with his presence.

That this argument is unfounded cannot be doubted; and the answer to it may be in several forms: (1) There never was at common law any recognized right to an indispensable thing called confrontation as distinguished from cross-examination. There *was* a right to cross-examination as indispensable, and that right was involved in and secured by confrontation; it was the same right under different names. This much is clear enough from the history of the Hearsay rule (*ante*, § 1364), and from the continuous understanding and exposition of the idea of confrontation (ante § 1395). It follows that, if the accused has had the benefit of cross-examination, he has had the very privilege secured to him by the Constitution."

"In dealing with *depositions* and *former testimony,* our Courts have almost unanimously received them in criminal prosecutions, as not being obnoxious to the constitutional provision. The leading opinions were rendered chiefly between 1840 and 1860. Up to 1886, apparently the only contrary precedent not overruled was an early Virginia case, afterwards often cited, which professed to decide the question merely on English precedents, and not on constitutional grounds, and proceeded on the authority of an earlier English treatise, which in turn went upon the authority of Fenwick's Trial,—a parliamentary decision precisely to the opposite effect, and misunderstood by the writer of the treatise. This early Virginia ruling, of so little weight in itself, served, however, to keep a doubt alive; and in the last generation a few ill-considered rulings in other jurisdictions have followed it. Apart from these rulings, it is well and.

properly settled that such evidence—assuming always that there has been a due cross-examination—is admissible for the State in a criminal prosecution, without infringing the constitution."

"The question, then, whether there is a right to be confronted with opposing witnesses is essentially a question whether there is a right of cross-examination. If there has been a cross-examination, there has been a confrontation. The satisfaction of the right of cross-examination (under the rules examined *ante,* §§ 1371-1393) disposes of any objections based on the so-called right of confrontation.

"Nevertheless, the secondary advantage, incidentally obtained for the tribunal by the witness' presence before it—the demeanor—evidence—is an advantage to be insisted upon wherever it can be had. No one has doubted that it is highly desirable if only it is available. But it is merely desirable. Where it cannot be obtained, it need not be required. It is no essential part of the notion of confrontation; it stands on no better footing than other evidence to which special value is attached; and just as the original of a document (*ante,* § 1192) or a preferred witness (*ante* § 1308), may be dispensed with in case of unavailability, so demeanor-evidence may be dispensed with in a similar necessity." Secs. 1397, 1398, 1396, Vol. 2, Wigmore on Evidence.

"It has long been a settled rule of evidence, as one of the exceptions to the general rule excluding hearsay, that the testimony of a witness given in a former action, or at a former stage of the same action, is competent in a subsequent action, or in a subsequent proceeding of the same action, where it is shown that such witness is dead, has

become insane or disqualified, is beyond the jurisdiction of the court (that is, out of the State), cannot conveniently be found, or has been kept away by the opposite party, where it is also shown that the former giving of such testimony was under oath, and that opposing party cross-examined, or was afforded an opportunity to cross-examine, such witness. This rule has been generally applied in criminal causes, and has been held not to be in conflict with Article 6 of the United States Constitutional Amendments, providing that 'in all criminal prosecutions the accused shall enjoy the right to be confronted with the witnesses against him,' nor in conflict with the State Constitution, such as ours (Article 6, § 7), which provides that 'in all criminal prosecutions the accused shall have the right to meet the witnesses against him face to face;' it being held that, where the defendant has once, at some proper stage of the proceeding, been confronted with and met such witness face to face, had cross-examined him, or been given the privilege to do so, the provisions of these Constitutions have been satisfied, and that such evidence is not objectionable on that account. Elliott, Ev. § 503; Jones, Ev. § 339; Wigmore, Ev. §§ 1365-1395; 12 Cyc. Law & Proc. p. 543; 16 Cyc. Law & Proc. p. 1091; Mattox v. United States, 156 U. S. 237, 39 L. Ed. 409, 15 Sup. Ct. Rep. 337; Bishop, Crim. Proc. 1194; State v. Manion, 19 Utah 505, 45 L. R. A. 638, 75 Am. St. Rep. 753, 57 Pac. 542." State v. Heffernan, 22 S. D. 513, 118 N. W. Rep. 1027, 25 L. R. A. (N. S.) 868

The case note in the above case is as follows:

"The objection generally raised to the admission at a trial of testimony given at the preliminary examination, by a witness who cannot be produced at the trial, is that the accused person would thereby be denied the right

guaranteed by the Constittuion of the United States, and by the constitutional or statutory provisions in most of the statutes, of being confronted with the witnesses against him, which includes the right of cross-examination, it being contended that this right is denied unless the accused is actually confronted with the witness against him at the trial which is to determine his guilt or innocence. On the other hand, it is contended that the accused person is afforded this right if he has had the opportunity to confront the witnesses against him, and subject them to cross-examination in the proceeding in which the testimony was taken, provided he was present as the party charged with the offense which was being investigated, and the offense there charged and the one being tried are substantially the same.

"This latter view is taken by an overwhelming majority of the courts, but the real basis for the admission of such testimony seems to be the necessity for its admission to present the miscarriage of justice, and the instances in which it is admitted are in reality exceptions to (sometimes recognized as such by the court), rather than compliance with, the rule that the accused is entitled to be confronted with the witness against him.

"As to the effect of the admission of such testimony upon the rights guaranteed to an accused person by the Federal Constitution it was held in West v. Louisiana, 194 U. S. 258, 48 L. Ed. 965, 24 Sup. Ct. Rep. 654, affirming 109 La. 603, 33 South. Rep. 618, that the constitutional provision giving the accused the right 'to be confronted with the witnesses against him' does not apply in prosecutions in State courts and that the reading, according to the State statute, of depositions taken at the examination of a witness who has permanently removed from the

State, does not deprive the accused of liberty without due process of law, or violate any provision of the Federal Constitution."

Section 11 of the Declaration of Rights of this State is as follows:

"In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury, in the county where the crime was committed, and shall be heard by himself, or counsel, or both, to demand the nature and cause of the accusation against him, to meet the witnesses against him face to face, and have compulsory process for the attendance of witnesses in his favor, and shall be furnished with a copy of the indictment against him."

Section 11 of the Declaration of Rights was not intended by the framers of the Constitution either to enlarge or abridge the privileges or rights of persons accused of crime, but to prevent the impairment of such rights or privileges by legislation as existed at common law.

"An important canon of construction is that constitutions must be construed with reference to common law, and although there is no common law of the United States in the sense of a national customary law, as distinguished from the common law of England, adopted by the several States, in interpreting the Federal Constitution recourse may still be had to the aid of the common law of England. It has been said that without reference to this common law the language of the Federal Constitution could not be understood. This is due to the fact that this instrument and the plan of government of the United States were founded on the common law as established in Eng-

land at the time of the Revolution. Phrases in the Bill of Rights taken from the common law, therefore, must be construed in reference to the latter." 6 R. C. L. 53.

Having this rule of construction before us we must determine what the common law was upon this subject of the right of the accused to meet the witnesses against him "face to face."

"Our Common Law on the subject comes from two ancient English statutes, which were accepted as of common-law force in Pennsylvania, in Maryland, and probably in the other States generally. They are 1 and 2 Phil. & M. c. 13, § 4, 5; and 2 and 3 Phil. & M. c. 10. By them, justices of the peace, committing or bailing one on a charge of felony, were to 'take the examination of the said prisoner, and information of them that bring him, of the fact and circumstances thereof,' and reduce the writing 'the same or as much thereof as shall be material thereof to prove the felony,' and certify it to the court before which the further proceedings were to occur." 1 Bishop's New Crim. Proc. § 1198, p. 733.

Again the same author sums up the common law: "Epitomized is the common-law doctrine as to depositions before committing magistrates, taken under statutes like the former English ones, in the later 11 and 12 Vict. c. 42, § 17, thus: 'If, upon the trial,' it appears 'that any person whose deposition shall have been taken as aforesaid is dead, or is so ill as not to be able to travel, and if also it be proved that such deposition was taken in the presence of the person so accused, and that he or his counsel or attorney had a full opportunity of cross-examining the witness, then, if such deposition purport to be signed by the justice by or before whom the same pur-

ports to have been taken, it shall be lawful to read such deposition as evidence in such prosecution, without further proof thereof, unless it shall be proved that such deposition was not in fact signed by the justice purporting to sign the same.'" Sec. 1201.

"§1204.  Constitutional—'Face to Face.'—The law, as expounded in the foregoing sections, is not in conflict with the constitutional guaranty, to an indicted person, of the right 'to meet the witness against him face to face.' At his already explained opportunity to cross-examine them, he does or may thus meet them."

It may be inquired did the legislature have the power by statute to prescribe that the testimony as set out in the bill of exceptions should be the exclusive manner of proving the evidence of a witness given at a former trial who is dead, insane or unable to be had.  We answer this in the affirmative, there being no constitutional prohibition as we hold to the introduction of such testimony upon the ground that the witness did not meet the accused face to face, it is clearly within the power of the legislature to provide the only manner or mode in which the testimony of such absent witness could be shown.

In the case of Sanford v. State, 143 Ala. 78, the court held that where the testimony had been taken down in writing of a witness at a preliminary trial that it was error to allow the justice who had taken such testimony to testify as to what the witness had said.  The law requiring the testimony of witnesses on a preliminary trial to be taken by a justice of the peace that the writing was the best evidence and in the head note to the above cited case stated the law to be "Where a magistrate, on the preliminary trial of a defendant charged with a felony,

takes down in writing the testimony given therein by a witness he cannot, on the trial by a jury testify as to what such witness said on examination in the preliminary trial, as the written notes of his testimony is the best evidence thereof."

We cite from the case of Jackson v. State, 81 Wis. 127, text 132, as follows: "In speaking of criminal cases, Mr. Cooley says: 'If the witness was sworn before the examining magistrate, or before a coroner, and the accused had an opportunity then to cross-examine him, or if there a former trial on which he was sworn, it seems allowable to make use of his deposition, or of the minutes of his examination, if the witness has since deceased, or is insane, or sick and unable to testify, or has been summoned but appears to have been kept away by the opposite party.' Cooley, Const. Lim. (6th ed.) 387, citing numerous cases. The Attorney General cites numerous cases under similar constitutional provisions to the same effect.

"Of course, to be admissible, such former testimony should be established or identified with reasonable certainty. Here the stenographer testified, in effect, that while he did not recollect the fact, yet he thinks he took down all the questions put to the witness, and his answers, and that he believed they were substantially correct. Counsel contend that this was not sufficient to authorize such admission, within the rule of Zitske v. Goldberg, 38 Wis. 216, and Elberfeldt v. Waite, 79 Wis. 284. In neither of those cases had such testimony been taken down by the official court reporter. In each it was taken down by a justice of the peace. In the former it was said by the present chief justice that 'the minutes of testimony taken by a justice of the peace on a trial before him are subjected to no such scrutiny (as in a bill of ex-

ceptions), and possess none of these important and essential elements of verity. On the contrary, they are made in the haste and confusion of trials, generally by men who are quite unusued to the business; and no power to make corrections after the trial is vested in any one. Hence the reasons for admitting such testimony when it is found in a settled case or bill of exceptions, entirely fail when the offered testimony is contained in the justice's minutes."

It is an elementary rule of evidence that the best evidence that the nature of the case permits should be resorted to, to prove a fact, and how any higher or better evidence of what a deceased or absent witness swore at a former trial can be produced than that contained in the bill of exceptions prepared by the defendant or his counsel and receiving the sanction and approval of the trial judge as being correct we cannot imagine.

We know of no better way of expressing our conclusion on the admissibility of such testimony in the manner prescribed by the statute than by quoting from the opinion in the case of United States v. Greene et al., 146 Fed. Rep. 787, text pages 799, 800 and 801, as follows:

"It is, however, urged that it is not competent in any criminal case to admit the testimony of a witness given on a previous trial unless the witness himself can be brought before the court. As tersely stated by the District Attorney, Mr. Akerman:

" 'The contention of the learned counsel would perhaps be better founded if the Supreme Court of the United States had not decided the precise question against him.'

"This decision is found in the Mattox Case, 146 U. S. 140, 13 Sup. Ct. 50, 36 L. Ed. 917. There two witnesses on

a former trial, Thomas Whitman and George Thornton, had since died. A transcribed copy of the reporter's stenographic notes was admitted by the court and constituted the strongest proof against the accused. The accused were charged with the capital crime of murder. There it was insisted as here, that the constitutional provision, that the accused shall be confronted with the witnesses against him, was infringed by permitting the testimony of witnesses sworn upon the former trial to be read. Said the Supreme Court, Mr. Justice Brown rendering the opinion:

" 'The idea that this cannot be done seems to have arisen from a misinterpretation of a ruling in the case of Sir John Fenwick.'

"This case was a parliamentary proceeding by bill of attainder. It was the last trial by bill of attainder among the English-speaking people. The charge was high treason. We gather from the luminous and brilliant pages of Macauley's History of England that, though his offense merely comprised a plot for the assassination of that Monarch, but the King could not forgive a gross and public insult which Fenwick had offered the Queen, the beloved and amiable Mary. There, however, the witness had not died. The wife of the accused had spirited him away, and, notwithstanding the bitterness of the Parliament, with that high regard for law which has characterized the English-speaking race, the testimony was excluded. But in that case there had been no opportunity for cross-examination on a former trial between the same parties. Nevertheless, the case misled a writer on evidence to state that it was authority for the proposition that the testimony of a deceased witness cannot be used in a criminal prosecution, and it possibly had the

same effect upon the learned counsel for the defendants in this case.

"The Supreme Court, however, had declared the rule in England to be clearly the other way, citing a number of notable precedents and an eminent text author. 2 Starkie on Evidence, p 208. And, said the learned justice delivering the opinion as to the practice in this country, 'we know of none of the States in which such testimony is now held to be inadmissible.' Certainly this is true in our own State. In that Code of our State which has made copious draughts, not only upon the English but the Roman law, whose first and perhaps most illustrious codifier, that noble Georgia, T. R. R. Cobb, has left the people whom he loved a juridicial monument in its inestimable pages not less valuable to them than the Code Napoleon to the people of France, we find in Section 1001 the provision following, which should satisfy the jurists and the people of this State:

'The testimony of a witness, since deceased, or disqualified, or inaccessible for any cause, given under oath on a former trial, upon substantially the same issue and between substantially the same parties, may be proved by any one who heard it and who professes to remember the substance of the entire testimony, as to the particular matter about which he testifies.'

"In some cases, recited by the Supreme Court in the Mattox Case where witnesses who had testified on a former trial were not dead, but were out of the State, and for similar reasons the testimony has been excluded; but said the Supreme Court:

'Upon the other hand, the authority in favor of the admissibility of such testimony, where the defendant was

present either at the examination of the deceased witness before a committing magistrate, or upon a former trial of the same case, is overwhelming.'

"There are, of course, grave reasons wherever it is possible that the witness who testifies against the accused should be present. These are recapitulated by the Supreme Court in the case just cited. But said that great tribunal:

'But general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case. To say that a criminal, after having once been convicted by the testimony of a certain witness, should go scot free simply because death has closed the mouth of that witness, would be carrying this constitutional protection to an unwarrantable extent. The law in its wisdom declares that the rights of the public shall not be wholly sacrificed in order that an incidental benefit may be preserved to the accused.'

"And in the same case it is further declared that:

'The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face and of subjecting him to the ordeal of a cross-examination."

"It adds that:

'All the authorities hold that a copy of the stenographic report of his entire former testimony, supported by the oath of the stenographer that it is a correct transcript of his notes and of the testimony of the deceased witness, such as was produced in this case, is competent evidence of what he said.'

See, also, U. S. v. Macomb, Fed. Case No. 15,702, vol. 26; Rice on Evidence, p. 345, et seq.; Starkie on Evidence, 409; Greenleaf on Evidence, 163; Roscoe's Criminal Evidence, p. 66; Reynolds v. U. S., 98 U. S. 145, 25 L. Ed. 244.

"There is a learned discussion of the entire topic in Wigmore on Evidence, vol. 2, Sec. 3905 et seq., and many authorities cited, leading the learned writer to the conclusion, as stated in section 1397, that such an argument as that presented by the counsel for the defendants is wholly unfounded. The contention is utterly inconsistent with the exigencies of society, and reduced to its last analysis, might even exclude on the trial the dying declarations of the innocent victim of unprovoked and secret murder or unnamable outrage."

For an interesting discussion of the subject see 24 Mo. 402. See also 8 R. C. L., p. 88; 132 Wis. 509; 122 Am. St. Rep. 989; 13 A. & E. Ann Cas, 969; 25 L. R. A. (N. S.) 868, 873; 125 N. W. (Mich.) 87; 16 Cyc. 1101; 68 Kan. 566; 1 Ann Cas. 468 Notes.

The constitutionality of Section 1, Chapter 5897, Acts of 1909, Section 1523, Compiled Laws, 1914, is not argued by counsel for plaintiff in error, and its validity was expressly recognized in Johnson v. State, 68 Fla. 528, 67 South. Rep. 100; Coley v. State, 67 Fla. 178, 64 South. Rep. 751. The statute is as follows: "In case any judgment at law rendered by any court of the State of Florida shall be reversed and a new trial awarded, and it be made to appear to the satisfaction of the court that any evidence used at the former trial, whether oral or written, and incorporated in the bill of exceptions, can not be had, then the bill of exceptions taken at the previous trial may be used as evidence upon any subsequent trial

of the case, as to any matter in issue at the former trial; provided, that no evidence given upon a former trial of any case pending in any of the courts of the State of Florida shall be used in evidence upon the trial of any cause in any of the courts in the State of Florida, except as herein provided."

The Constitution in Section 11 of the Declaration of Rights provides that "In all criminal prosecutions the accused shall have the right  *  to meet the witnesses against him face to face."

"The object of this provision manifestly is to exclude testimony by depositions, by requiring it to be given orally, in the presence of the accused, on the trial. The admission of testimony by depositions against the accused in a criminal cause would often afford the prosecutor great advantages over him, as well as furnish, at times, opportunities for abuses beyond the reach of detection by the defendant. Deprived of this right, the accused would often be without opportunity of cross-examination, without the means of seeing, hearing, or knowing the persons who testify against him, and without the advantage of an oral examination of the witnesses before the jury which is to decide upon his case. But important as this right is, as established at common law, and secured by the Constitution, it has application to the matter of the personal presence of the witness on the trial, and not to the subject-matter or competency of the testimony to be given. The requirement that the accused shall be confronted, on his trial, by the witnesses against him, has sole reference to the personal presence of the witnesses, and it in nowise affects the question of the competency of the testimony to which he may depose. When the accused has been allowed to confront, or meet

face to face, all the witnesses called to testify against him on the trial, the constitutional requirement has been complied with." Summons v. State, 5 Ohio St. 325, text 340.

Where a defendant has been confronted with the witnesses against him in a former trial of the same cause, and an opportunity was afforded to the defendant to fully cross-examine the witnesses, the testimony given by witnesses on such former trial may be proved in the manner provided by law at a subseqnent trial as secondary evidence, if it is satisfactorily shown that the witnesses have since died, become insane, left the jurisdiction of the court, or is sick and unable to attend or to testify; and the admission of such evidence under the circumstances does not violate the organic right of an accused to meet the witnesses against him face to face. Hawkins v. United States, 3 Okl. Cr. 651, 108 Pac. Rep. 561; 2 Wigmore on Evidence, §§ 1397, 1406, pp. 1754, 1766.

As the constitutional right of the accused to meet the witnesses against him face to face was under the authorities satisfied when he met the witnesses and was accorded full opportunity to cross-examine them on the former trial, the circumstances under which and the means by which evidence of the testimony of the absent witness given at the former trial may be adduced at the subsequent trial as secondary evidence, is regulated by the statute; and the circumstances of this case bring it within the statute, both as to the conditions under which and the means by which the secondary eaidence was adduced.

Even were we to concede that the testimony of a witness at a former trial could only be given under the conditions imposed by the common law and these conditions were continued by the Constitution, such conditions arise

when the witness is dead, or insane, or beyond the juris-
diction of the court or unable to travel, we think the evi-
dence showed that the absent witnesses came under the
last mentioned class of cases as shown by the testimony
before the court as to their condition and that this class
is among those included in the rules of the common law
on the subject.

The constitutional right to meet witnesses face to face
is thus explained in 1 Greenleaf on Evidence, Sec. 163f:
"The constitutional clause purported merely to adopt the
general principle of the Hearsay Rule, that there must
be confrontation, i. e. the power of cross-examination, for
infra-judicial witnesses; but it did not purport to enu-
merate all the exceptions and limitations to that prin-
ciple. There were then a number of well-established ex-
ceptions, and there might be others in the future; the
Constitution indorsed the general principle, subject to
these exceptions; merely naming and describing it suf-
ficiently to indicate the principle intended—just as the
brief constitutional sanction for trial by jury did not
attempt to enumerate the classes of cases to which that
form of trial was appropriate nor the precise procedure
involved in it, and has always been construed as not abso-
lute and universal in effect, but as subject to the limita-
tions and unessential variations understood to accom-
pany that institution. Thirdly (perhaps only as another
aspect of the preceding reason), the constitutional re-
quirement is limited to the mode of taking testimony at
the trial; it does not prescribe what kinds of testimony
shall be given infra-judicially, but only what mode of
procedure—i. e. not a secret or *ex parte* examination—
shall be followed for such testimony as by the ordinary
and existing law of evidence is required to be given infra-
judicially. Such is the better reasoning accepted by most

Courts as here applicable. It follows that the constitutional requirement of confrontation is not violated by dispensing with the actual presence of the witness at the trial, if he has already been subject to cross-examination, or if his assertions are reecived under some recognized exception to the Hearsay rule."

See 2 Wigmore Ev. Sec. 1397 and Notes.

The verdict is fully sustained by the evidence. Affirmed.

WHITFIELD AND ELLIS, J. J., concur.

BROWNE, C. J., AND TAYLOR, J., dissent.

BROWNE, C. J., dissenting.—I cannot concur in the conclusion reached by the majority of the court in this case, or the reasons given for it.

I think the charge on *alibi* was harmful error.   The Court, after correctly charging the law in relation to the defense of an *alibi,* destroyed its effect and changed the rule by giving this erroneous instruction: "The defense of an alibi is, of all other testimony, the most decisive when duly substantiated; but the evidence adduced in support of it requires to be minutely considered, and *must be such as to render it impossible that* the crime could have been committed by the party who claims that he was not present and could not be guilty as charged." The rule, in relation to the defense of an *alibi*, is, "It is enough if the proof adduced in support of it, viewed in connection with all the testimony in the case, creates such a probability of its own truth as to engender a reasonable doubt of the truth of the charge upon which the defendant is arraigned; and this might be affected, even though the jury did not feel positively assured of the ve-

racity of the witnesses or of the correspondence of time. If, looking to all *the evidence, inculpatory and exculpatory, they entertain a reasonable doubt of the prisoner's presence at and participation in the crime,* they should acquit." The italics are mine. 8 Ruling Case Law, 224; Prince v. State, 100 Ala. 144, 14 South. Rep. 409; Carlton v. People, 150 Ill. 181, 37 N. E. Rep. 244; French v. State, 12 Ind. 670; State v. Hardin, 46 Iowa 623; State v. Ardoin, 49 La. Ann. 1145, 22 South. Rep. 620; Pollard v. State, 53 Miss. 410; State v. Campbell, 210 Mo. 202, 109 S. W. Rep. 706; State v. McClellan, 23 Montana 532, 59 Pac. Rep. 924; Henry v. State, 51 Nebraska 149, 70 N. W. Rep. 924; Johnson v. State, 88 Neb. 565, 130 N. W. Rep. 282; Turner v. Commonwealth, 86 Pa. St. 54; State v. Thornton, 10 S. D. 349, 73 N. W. Rep. 196, 41 L. R. A. 530.

On this subject the opinion of the majority of the court says: "We cannot commend as a model for clearness on the defense of an alibi the charge as given and think it would have been better to have omitted the part enclosed in brackets. The judge, after correctly charging upon the defense of an alibi by the words enclosed in brackets, charged an abstract proposition of law—the definition of an alibi—and we cannot say that it was so misleading or confusing to the jury as to constitute reversible error on the judge refusing the requested charge."

I quite agree with the statement that this charge was not "confusing." On the contrary, it was quite clear and positive—that the evidence of an alibi must be such as to render it "impossible" for the defendant to have committed the crime. That has never been held to be the requirement of the evidence to support an *alibi;* but the rule given *supra* is the true rule. There is a vast differ-

ence between a rule that the evidence must be such as to render it *impossible* for the defendant to have committed the crime, and one that only requires it to raise a reasonable doubt of the prisoner's presence at and participation in the crime.

That is not only the general rule, but it has been the supposedly settled law of this State since the decision in Adams v. State, 28 Fla. 511, 10 South. Rep. 106.

In that case as in this, the court gave an instruction that was in part correct and unsound in part; and that was one of the errors on which the Adams case was reversed.

The wording of the instructions in the instant case and the Adams case *supra* is almost identical. In the Adams case the court charged the jury in part, "the evidence must be *such as to render it impossible* that the crime could have been committed by the person that claims he was not present, and that he could not be guilty as charged."

In the instant case the court charged that the evidence "must be *such as to render it impossible that* the crime could have been committed by the party who claims that he was not present and could not be guilty as charged."

In the Adams case this court said that this instruction was error. In the instant case the majority of the court say it is not error. In the discussion of this charge in the Adams case, this court said:

"On the subject of an *alibi* the judge charged the jury as follows, viz.: 'If you find from the evidence and are satisfied the defendant was not present when the deceased was killed, you must find him not guilty. To

make the defense of an *alibi* available as defense the evidence of its existence must cover the whole time when the presence of the defendant was required; you must determine from the evidence whether the defendant has proven that he was not present when Moore was killed or not; if you have a reasonable doubt in your minds as to whether he was present at the time Moore was killed, you should find him not guilty; *when the defense of an alibi is clearly proven by reliable and truthful evidence, it is of all others the most decisive, because it is impossible for a man to be in two separate places at the same time, the evidence must be such as to render it impossible that the crime could have been committed by the person that claims he was not present, and that he could not be guilty as charged;* the evidence, in support of it and against, as well as all other evidence in the case, demands your most careful and thoughtful consideration.' The portion of the charge in italics was excepted to by the accused.

"We think the proposition of law stated in the first clause of this charge is proper; that is, to the effect, that if the jury have a reasonable doubt as to whether the defendant was present at the scene of the homicide, he is entitled to the benefit of such doubt and should be acquitted. But we think that the subsequent portion of the charge, from its phraseology, may have a tendency to mislead the jury and to obliterate from their minds the idea that a reasonable doubt, arising out of the evidence as to the *locus* of the prisoner at the time of the killing must work an acquittal. We think that the evidence in support of an *alibi* need not be absolutely clear; it is sufficient if there is enough to produce in the minds of the jury a reasonable doubt as to the presence of the prisoner at the scene the killing. Neither do we think

that the evidence of an alibi should in any case make it absolutely impossible for the prisoner to be present at the killing; it is sufficient if it raises a reasonable doubt in the minds of the jury from all the circumstances, whether he was present or not. 1 Greenleaf on Evidence, Sec. 81b; State v. Waterman, 1 Nev. 543; Turner v. Commonwealth, 86 Penn. St. 54; People v. Fong Ah Sing, 64 Cal. 253; Landis v. State, 70 Ga. 651; Pollard v. State, 53 Miss. 410; Means v. State, 10 Texas Ct. App. 16; State v. Lewis, 69 Mo. 92; People v. Pearsoll, 50 Mich. 233; Houston v. State, 24 Fla. 356; 5 South. Rep. 48; Kerr on Law of Homicide, Secs. 512, 522."

I think the instruction in relation to flight is erroneous and harmful, because it charges on the effect of the testimony. The court said: "The fact of flight is a circumstance to be considered by the jury as *tending to increase* the *probability* of the defendant being the guilty person." (The italics are mine.) Here we have a statement, by the court, that there is a "probability" of the prisoner's guilt, which the testimony as to his flight tends to *increase*.

I think the court erred in admitting in evidence over the objection of the defendant, the testimony of Harrison Davis and Saphronia Holmes given at a former trial of the case, and incorporated in the bill of exceptions.

Prior to 1893 the evidence incorporated in a bill of exceptions could not be used as evidence upon a subsequent trial of the same case. Then was enacted Chapter 4135, "That in case any judgment at law rendered by a Circuit Court shall be reversed and a new trial awarded, and it be made to appear to the satisfaction of the court that any evidence used at the former trial, whether oral or written, and incorporated in the bill of exceptions, cannot

be had, then the bill of exceptions taken at the previous trial may be used as evidence upon any subsequent trial of the case, as to any matter in issue at the former trial."

There is internal evidence in the fact itself, that it was not intended to apply to criminal cases. At the time it was passed the Constitution authorized the creation of criminal courts with jurisdiction of all criminal cases not capital, and where such criminal courts were established the jurisdiction of Circuit Courts in criminal cases was limited to those not cognizable by inferior courts.

The limitation in the statute of the use of evidence incorporated in a bill of exceptions to cases tried in the Circuit Courts prescribed the use of such testimony in any criminal case not capital, in counties where Criminal Courts were established. If, therefore, this act was intended to be applicable to criminal cases, we would have the remarkable, if not monstrous proposition, that a man on trial for his life might be convicted and executed on a transcript of the testimony used on a former trial, but a person on trial for an offense less than capital could only be convicted on testimony given in his presence, in open court.

I am not commenting upon the power of the Legislature to make this discrimination if it had the power to make the law apply to criminal cases at all, but to show from its extreme unreasonableness that it was not the legislative intent for the law to apply to criminal cases.

It is true that in 1909 this act was amended and the words "any court of the State of Florida" substituted for "a Circuit Court," but if the original act did not apply to the criminal cases, this amendment would not have that effect.

Examining further into the language of the statute, we find that in both the acts, the use of testimony incorporated in a bill of exceptions can only be used "in case any *judgment at law* * * * shall be reversed and a new trial awarded." If the Legislature meant to include criminal as well as civil cases, the words "at law" are superfluous. We must, however, give weight to every word in the statute, and it is apparent that the purpose of the Legislature in using the words "at law" was to make a distinction between a class of cases where the testimony contained in a bill of exceptions might be used, and those when it should not be used. Certainly the words "at law" were not intended to distinguish common law from chancery causes, because the word "judgment," of itself makes that distinction, so also of the words "new trial awarded," and "bill of exceptions," as none of these is applicable to a chancery cause. Therefore, had the Legislature intended to include criminal cases it would have omitted the words "at law," which are words of limitation.

The distinction between cases "at law" and "criminal cases" is made in the Constitution. In Sec. 5, Art. V, we find: "The Supreme Court shall have appellate jurisdiction in all cases *at law* and in equity originating in Circuit Courts, * * * and in all criminal cases originating in the Circuit Courts. Sec. 11 of Article V provides: "The Circuit Courts shall have exclusive original jurisdiction in all cases in equity, also in all cases *at law* * * * and of all *criminal cases* not cognizable by inferior courts." Section 17 of the same article ordains "The County Judge shall have original jurisdiction in all cases *at law* * * * and of *such criminal* cases as the Legislature may prescribe." Section 18 of the same Article: "The Legislature may organize in such counties as it may think

proper, County Courts which shall have jurisdiction of all cases *at law* in which the demand or value of the property involved shall not exceed $500.00 * * * and of misdemeanors." Section 22 of the same Article: "In each County where there is no County Court, as provided for in Section XVIII of this Article, the justices of the peace shall have jurisdiction in cases *at law* in which the demand of value of the property involved does not exceed $100.00 * * * and in such *criminal* cases, except felonies, as may be prescribed by law."

Another indication that the provisions of this act were to apply to civil and not to criminal cases is that in referring to the evidence that may be used at a subsequent trial if incorporated in a bill of exceptions, the act says that such testimony may be so used, "whether oral or written." In civil causes the testimony may be either oral or by depositions in writing. As this was not then permitted in criminal cases, it is further internal evidence of the intention of the Legislature that the act should apply only to civil causes.

The opinion says: "In the earlier days the testimony of a witness given at a former trial was confined to causes where the witness was dead or had become insane, or beyond the seas or the jurisdiction of the court, but the tendency of the modern decisions has been to enlarge the rule of evidence as to the admission of such testimony."

The question here involved is not a *rule of evidence*, but a solemn constitutional provision, that no court or Legislature may rightfully change or enlarge.

In the Florida statute under consideration practically no restriction is placed on the use of testimony incorporated in a bill of exceptions; merely that it "cannot be

had." This is so uncertain as to mean nothing. The decision in this case holds that the power to permit this is lodged in the Legislature, and that it is not in conflict with Article XI of the Bill of Rights. It follows, therefore, that the Legislature may permit the use of all the testimony incorporated in a bill of exceptions in the discretion of the court, or the State's attorney, and under any and all circumstances.

The Legislature, therefore, in order to save the expense of a second trial may enact "That in case any judgment rendered in a civil or criminal cause in any court of the State of Florida shall be reversed and a new trial awarded, any evidence taken at the previous trial incorporated in a bill of exceptions may be used as evidence upon any subsequent trial of the case, as to any matter in issue at the former trial." The only limitation in the statute is, where the evidence "cannot be had;" but this limitation is a matter of legislative discretion, and under the doctrine of this case the Legislature may eliminate these words and permit the use of all the evidence incorporated in the bill of exceptions, at the discretion of the State's attorney. When this is done we may have the spectacle of a man put on his second trial for a capital offense, convicted and executed, without a single witness appearing in the court room to testify before the jury that convicted him.

It is entirely a question of power. If the Legislature has the power to permit the use of testimony incorporated in a bill of exceptions, when in the discretion of the judge "it cannot be had," it has the power to remove this restriction, and permit its use under all circumstances. It is no answer to say that this would not be done. If the power is there it may be done.

As was said by Chief Justice MARSHALL, "Questions of power do not depend on the degree upon which it may be exercised. If it may be exercised at all it must be exercised at the will of those in whose hands it is placed * * * We are told that such wild and irrational abuse of power is not to be apprehended, and is not to be taken into view, when discussing its existence. All power may be abused; and if the fear of its abuse is to constitute an argument against its existence, it might be urged against the existence of that which is universally acknowledged, and which is indispensable to the general safety." Brown v. State of Maryland, 12 Wheat. (U. S.) 419.

It may not be amiss to say here that the writer was a member of the Legislature when Chapter 4135 was enacted. In that body were many members of the old-school strict-constructionists, jealous of any attempts to change, modify or destroy constitutional rights, who would have resisted to the end the passage of this Act if it had been intended to apply to criminal prosecutions.

It is true that this court has considered this statute as applying to criminal cases (Putnal v. State, 56 Fla. 86, 47 South. Rep. 854; Coley v. State, 67 Fla. 178, 64 South. Rep. 751; Johnson v. State, 68 Fla. 528, 67 South. Rep. 100), but the questions here presented were not discussed and do not appear to have been urged. If a more careful consideration of the subject induces a different conclusion, the doctrine of *stare decisis* should not deter us from so announcing. This court did not hesitate to do this when the question involved was the measure of damage for failure to transmit and deliver a telegraphic message in cipher, Western Union Tel. Co. v. Wilson, 32 Fla. 527, 14 South. Rep. 1, overruling Western Union Tel. Co. v. Hyer Bros., 22 Fla. 637, 1 South. Rep. 129.

In Pollock v. Farmers' Loan & Trust Co., 157 U. S. 429, 15 Sup. Ct. Rep. 673, it was held: "The doctrine of *stare decisis* is a salutary one, and is to be adhered to on proper occasions, in respect of decisions directly upon points in issue; but this court should not extend any decisions upon a constitutional question, if it is convinced that error in principle might supervene."

The facility with which the doctrine of this decision may be extended in future constitutional construction, far beyond the consequences of this case, make the words of Mr. Chief Justice FULLER of peculiar applicability.

In Denney v. State *ex rel.* Basler, 144 Ind. 503, 42 N. E. Rep. 929, it was said: "More than this, no property right or contract between the parties being involved, it will not be considered that the rule of *stare decisis* requires that, in deciding so grave a matter as that of the constitutionality of an act of the Legislature, we should be bound by even our own former decisions.

"In such a case, as forcibly said by Chief Justice BLECK-LEY, in Ellison v. Georgia, etc., R. R. Co., 87 Ga. 691, the maxim for a supreme court, 'supreme in the majesty of duty as well as in the majesty of power,' is not '*stare decisis*,' but '*fiat justitia*.' Let this decision be right, whether other decisions were right or not."

I am much impressed with the force and wisdom and courage displayed by U. S. District Judge PRENTISS in overruling a former decision:

"An opposite decision having been recently pronounced in a neighboring circuit, I am now called upon to re-examine the question: and I can very freely say, that it is not at all a subject of regret, that an opportunity is thus af-

forded me to review my former opinion, and to overrule it if found to rest on mistaken principles, or unsound reasoning. When Lord Hardwick, having reason to alter his opinion on a particular occasion, said he was not ashamed of doing so, for he always thought it a much greater reproach in a judge to continue in his error than to retract it, he exhibited an example of true wisdom and real elevation of character, which it would be well for all judges to take as a guide." In the matter of Welman, 20 Vt. 653.

Conceding, however, that the Legislature intended this act to include criminal as well as civil cases, it is repugnant to Section 11 of the Bill of Rights of our Constitution.

"In all criminal prosecutions the accused shall have the right *  *  * to meet the witnesses against him face to face."

This language is so clear and unambiguous as to make the resort to construction to change its palpable meaning, not only unnecessary but iconoclastic.

In order to sustain the constitutionality of this act, however, this court seeks and finds support in decisions that have construed away the constitutional right of an accused person, and when it is through all that is left of what has been always regarded as a bulwark of defense for a person accused of crime is that "In *one* criminal prosecution he shall have the right to *cross-examine* the witnesses against him."

As that is a right that we would have without this constitutional guarantee, its purpose in the Constitution is by this decision made perfunctory.

The entire discussion of the majority of the court, and of those courts that sanction the nullification of this con-

stitutional protection, is that this provision of the Constitution is to be limited to such rights as the prisoner had under the common law. Then why was it put in the Constitution?

Is it not more reasonable to say that the framers of the Constitution being familiar with the common law right of a prisoner to cross-examine the witnesses against him, wrote this provision, not for the mere pastime of expressing that right, but because they intended a greater right— one very essential to the protection of life and liberty— and they wrote it in the Constitution as plainly as language is capable of.

The opinion in this case quotes approvingly from the case note to State v. Hefferman, 22 S. D. 513, in 25 L. R. A. (N. S.) 868, as follows: "This latter view is taken by an overwhelming majoirty of the courts, but the real basis for the admission of such testimony seems to be the necessity for its admission to prevent the miscarriage of justice, and the instances in which it is admitted are in reality exceptions to (sometimes recognized as such by the court), rather than compliance with, the rule that the accused is entitled to be confronted with the witness against."

This extract which is incorporated in the opinion says that the instances in which Constitution is not obeyed, are *"exceptions to,* rather than *compliance* with, the *rule* that the accused is entitled to be confronted with the witnesses against him." I again call attention to the fact that it is not a *"rule"* that we are considering, but a constitutional mandate; this court having adopted the doctrine that is thus summed up in the case note, the doctrine of this case is that the courts and the Legislature may

make exceptions to constitutional inhibitions, by designating them "rules."

In time to come, when the exigencies of some peculiar condition, or "the prevailing morality or strong and preponderant opinion" demands, this case will be cited as authority for disregarding some other constitutional mandate, on the ground that exceptions may be made thereto.

In order to sustain the constitutionality of the statute as applied to criminal cases, the court has not only to change these words of the Constitution from, "meet the witnesses against him face to face," to "cross-examine them," but to change the word "all" to "one" so that the Constitution will read, "In *one* criminal prosecution, the accused shall have the right to *cross-examine* the witness against him."

The word "all" has so positive and clear a meaning, and is so comprehensive, that the exigencies must be very strong to prompt an attempt to construe it. The defendant in this case has been prosecuted twice. The word "all" in the Constitution covers both prosecutions, but this court says, "No, it means only one."

Robert Blackwell is not here complaining that he was deprived of his constitutional right in a prosecution where no harm befell him, but that he was deprived of that right in the prosecution whereby his life was forfeited. The answer of this court is "because you were not deprived of your constitutional right in another prosecution from which you escaped harmless, you cannot be heard to complain if you are deprived of that constitutional right in a prosecution, whereby your life is to be forfeited."

Much of the opinion of the majority of the court is devoted to giving reasons for its conclusion that the clause

of the Constitution that we are considering does not mean just what it says.

A strict constructionist (a class that is becoming fewer under onslaughts on the Constitution) does not approve of seeking a reason for constitutional mandates, when they are plain and unequivocal, I shall, therefore, not attempt to give reasons why I believe that the provisions of Section 11 of the Bill of Rights should be strictly enforced, but will point out some of the consequences which must follow the denial of them.

Under the practice sanctioned by this decision the jury trying a prisoner is deprived of the benefit of seeing and hearing the witnesses and thereby judge their credibility. Baggott v. Otis, 65 Fla. 447, 62 South. Rep. 362; Baxter v. Liddon, 62 Fla. 428, 56 South. Rep. 410.

Juries have been known to refuse to render a verdict against an accused, because some of the members would not believe a witness on account of his demeanor when giving his testimony. At a subsequent trial of that cause the testimony of such a discredited witness incorporated in a bill of exceptions could be used before another jury, freed from the indicia of its falseness.

The reason is advanced that the now recognized right to admit dying declaration justifies the construction placed upon Section 11 of the Bill of Rights by this decision. There seem to be two fallacies in this proposition; one, that conceding that the rule admitting dying declarations as an abridgment of a constitutional right, it, therefore, furnishes a reason for further abridgment; the other, that only by a strained construction can it be held that testimony concerning dying declarations comes within the constitutional inhibition under consideration.

Dying declarations do not prove themselves, but must be established by witnesses whom the accused has a right to meet "face to face." It is a fiction that calls a dead man a witness. The witness is the person who is sworn and testifies in court before the jury on the trial of the accused to certain facts and circumstances. Among these are dying declarations, statements by the accused, reports of firearms, groans, screams, footprints, fingerprints, etc. These latter are frequently referred to as "mute witnesses," but that is figurative rather than legal language. The witness whom a prisoner has the constitutional right to meet face to face is the person who takes the stand and testifies in court under oath with regard to these several facts and circumstances.

The history of criminal trial furnishes abundant instances of witnesses testifying falsely at one hearing, and at a subsequent trial recanting and telling the truth, or declining to take the stand and repeat their former false testimony. Under such circumstances if a witness should absent himself rather than again testifying falsely, his former false testimony could be used against the prisoner.

Section 11 of the Bill of Rights guarantee other rights to the accused than the one under discussion.

As to one of these guarantees, this court says that it does not mean that "*in all criminal* prosecutions" he shall have these rights, but it is sufficient if he has enjoyed such right *once*. Applying this doctrine to the other rights guaranteed by Section 11, and there is no escape from the conclusion that if a prisoner has *once* had a "speedy" trial he cannot be heard to complain if thereafter he remains in confinement for an indefinite period; that having *once* had a "public trial," the second trial need not be public;

that having *once* been tried "in the county where the crime was committed," he may at the caprice of the State be tried elsewhere; that having *once* been "heard by himself, counsel, or both," he may at a subsequent trial be deprived of this right. These rights—to have a speed trial—a public trial—to be tried in the county where the crime was committed—to be heard by himself, or counsel, or both—to meet the witnesses against him face to face—are on a parity, and the reasoning by which the conclusion is reached that having *once* met the witnesses against him face to face, the guaranty of the Bill of Rights has been secured to him, applies with equal force to each of the other rights enumerated.

We say that having once exercised his right to meet his witnesses against him face to face, the requirements of the *Constitution* have been complied with, and he cannot demand that right at a subsequent trial. It follows, therefore, if he has had one public trial, the second trial may be a star chamber proceeding, and he cannot be heard to complain because he has *once* been granted the privilege that the Constitution guarantees him; he may be tried by a hostile, partial jury, and cannot be heard to complain if he has once had a trial by an impartial jury; he may on a second trial be refused "compulsory process for the attendance of witnesses in his favor," and cannot be heard to complain, if at a former trial compulsory process was granted him.

This decision does not say this, but it is the logic of the case.

We do not bite so large a piece out of the Constitution at one time, but afford authority to nibble it away piecemeal.

The decision contains copious citations from text writers and court decisions, to sustain the doctrine that the supposed protection afforded by Section 11 of the Bill of Rights is in fact and in law only the idle iteration of a common law right that existed before the adoption of the Constitution; no more, and no less. These and similar decisions nibbling away constitutional rights, have had much to do with the scant respect for the Constitution that is entertained by many in this country, and arouses lovers of constitutional government to the necessity of returning to the Constitution as the fountain and fortress of the rights of persons and the rights of property, and led the National Security League to establish September 17th as Constitution Day.

In vain were the ceremonies observed on that day—in vain were addresses delivered and papers read urging a back-to-the-Constitution movement, if courts adhere to decisions that destroy its safeguards. One of the papers prepared for the celebration of Constitution Day began with these words: "In 1875 the famous German historian, Von Holst, reproached the American people for the sin of worshipping their own Constitution. His words sound strange today, 'From the close of the century  *  *  .* the Constitution has been the political Bible of the people.' It is now 1919 and we are keenly conscious that conditions have changed. No reputable scholar would today say that our people worship their Constitution. No leader would complain that they were compelling him to offer its adoration. Instead of soft sounds of adoring voices chanting praise, the air is rent with the strident tones of harsh and hostile criticism. And as we listen, we seem again to catch the accent of the German tongue, no longer critical, but exultant, 'The worship of the Constitution has

ceased. Its altars are deserted. Its banner touches the dust. Its adorers are casting longing eyes after new and strange gods.' The taunt stings like the insult of a blow. Truth gives it power; for it is partly true. The love of our Constitution is fading."

One courageous decision refusing to follow the latitudinarian constructions of the past, may be the advance guard of a line of decisions overruling those that have lightly ignored it, or construed away its solemn guarantees. It has been well said: "What the courts uphold today is not the measure of what they will uphold tomorrow. Their entire history shows that courts advance with, or a little behind, the advance of civilization. One or two of them are a little ahead—are leaders."

This court might well have taken a stand among the leaders—a little in advance—of a movement—that must come if the Constitution is to survive—to get back to a strict construction of constitutional limitations upon the exercise of legislative, executive and judicial powers.

TAYLOR, J., concurs.