# Supreme Court of Florida

_____

No. SC13-1551
_____

**KHALID ALI PASHA,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[May 11, 2017]

PER CURIAM.

This case is before the Court on direct appeal, following a retrial, from a

judgment of conviction of two counts of first-degree murder and two sentences of

death for the slaying of Robin Canady and Reneesha Singleton.[1] We have

jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we

affirm Khalid Ali Pasha's convictions but vacate the death sentences and remand

for a new penalty phase based on the United States Supreme Court's opinion

---

1. In 2007, Pasha was tried, convicted, and sentenced to death for the two murders, but his convictions and sentences were reversed due to a violation of his right to self-representation. Pasha v. State, 39 So. 3d 1259 (Fla. 2010).

in <u>Hurst v. Florida</u> (<u>Hurst v. Florida</u>), 136 S. Ct. 616 (2016), and this Court's opinion on remand in <u>Hurst v. State</u> (<u>Hurst</u>), 202 So. 3d 40 (Fla. 2016), <u>petition for cert. filed</u>, No. 16-998 (U.S. Feb. 13, 2017).

## FACTS AND PROCEDURAL HISTORY

At approximately 10 p.m. on August 23, 2002, Robin Canady drove to the Woodland Corporate Center ("WCC") in her white Buick to pick up Reneesha Singleton, her daughter, from a training class. Earlier that day, Canady had discussed with Pasha, her husband, Canady's plan to pick up Singleton. That same evening, Pasha drove to the WCC in his white work van after visiting his ex-wife. Upon arriving at the WCC, Pasha put on a white jumpsuit and white boots. He then walked to Canady's vehicle, sat in the backseat while Canady remained in the driver's seat, and awaited Singleton's arrival. Pasha was still sitting in the backseat of Canady's vehicle when Singleton entered it.

At approximately 11:15 p.m. on that day, Jose Sanchez observed Pasha walking through the WCC wearing a white jumpsuit and white boots, covered in blood, and carrying a shiny object. Mr. Sanchez called his wife Gigi and told her to remain where she was until he came to get her. After Mr. Sanchez picked up Mrs. Sanchez in their red pickup truck, Mrs. Sanchez called 911 and provided information to the 911 dispatcher. While Mrs. Sanchez remained on the phone with the 911 dispatcher, the Sanchezes observed Pasha run into a wooded area near

a parking lot wearing the white jumpsuit and white boots, covered in blood, and carrying a shiny object. When Pasha emerged from the wooded area, the Sanchezes observed him wearing tan pants and a white t-shirt. The Sanchezes then observed Pasha leaving the WCC in his white work van. The Sanchezes followed Pasha and continued to provide detailed information to the 911 dispatcher including the license plate number of Pasha's vehicle.

Deputy Stahlschmidt and Deputy Mason responded to the dispatch that resulted from Mrs. Sanchez's 911 call. Upon nearing the WCC, the deputies observed Pasha's white van stopped at a red light followed by the Sanchezes' red pickup truck. The deputies observed the Sanchezes flashing their lights, motioning toward Pasha's van, and yelling. After making a U-turn, the deputies pulled directly behind Pasha's van and approached it on foot. Deputy Stahlschmidt approached the driver's side of the van and observed that Pasha appeared nervous, was sweating profusely, was gripping the wheel tightly, and had blood on his white t-shirt. Deputy Mason approached the passenger's side of the van, observed a white, bloody jumpsuit and white boots through the rear window of the van, and gave a danger signal to Deputy Stahlschmidt. Deputy Stahlschmidt asked Pasha to exit the van and noticed that Pasha was wearing dress pants and a white t-shirt without shoes. When Deputy Mason asked Pasha if he was injured, Pasha claimed

that the blood came from a rabbit. Deputy Mason immediately advised Pasha of his <u>Miranda</u>[2] rights.

After the stop, the Sanchezes led the deputies into the WCC and identified the area where they had seen Pasha. During this trip, Deputy Stahlschmidt entered a cul-de-sac where he observed blood and a pair of shoes in the middle of the street. After exiting the patrol car, Deputy Stahlschmidt found Canady's vehicle covered in blood and crashed into a wall. He then observed a bloody fire hydrant and bloody drag marks going into a nearby wooded area. After walking approximately fifteen feet into the wooded area, Deputy Stahlschmidt found the bodies of Canady and Singleton, both of which showed significant signs of trauma. While neither victim had a pulse, both bodies were warm.

Soon thereafter, Crime Scene Technician Egan began processing the crime scene. Egan found blood smears consistent with having been made by hands on both the trunk and passenger's side roof of Canady's vehicle. Inside the vehicle, Egan found blood on numerous surfaces including the front seats, the console, the armrest, and the passenger's front door. Egan also observed blood spatter on the dashboard and windshield.

---

2. <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

During a search of Pasha's van after a warrant had been obtained, Pasha's white, bloody jumpsuit and white boots were seized. Inside one of the boots was a bloody, broken, 18" to 20" bat made of wood with a metal rod running through it known as a "tire thumper." In the other boot, a bloody butcher knife and latex gloves were found. During a search of Canady's vehicle, Crime Scene Analyst Lynn Ernst observed that the front seat was soaked with blood, multiple surfaces were spattered with blood, the rear seat contained little to no blood, and cuts in the headliner of the vehicle were made by a sharp object. Ernst concluded that this evidence was consistent with the perpetrator having sat in the back of the vehicle. Additionally, Ernst compared photographs of footwear impressions from the cul-de-sac to boots recovered from Pasha's van, and concluded that the impressions in the cul-de-sac were consistent with having been made by the boots found in Pasha's van.

Patricia Bencivenga, a DNA analyst, found evidence of blood on the knife and rubber gloves found in one of Pasha's boots, the tire thumper found in Pasha's other boot, and swabs taken by crime scene personnel. Bencivenga also found evidence of blood on Pasha's white boots, white jumpsuit, white t-shirt, and tan pants. Bencivenga matched Canady's DNA to the blood found on the tire thumper, Pasha's right boot, and Pasha's white t-shirt. Bencivenga matched Singleton's DNA to the blood on the knife, Pasha's pants, and a swab of Pasha's face.

Bencivenga matched the DNA of both Canady and Singleton to the blood on Pasha's jumpsuit.

Dr. Volnikh, a medical examiner, visited and examined the crime scene. At the scene, she observed blood spatter consistent with arterial spray on the interior of Canady's vehicle consistent with the fact that both victims had severed carotid arteries. Dr. Volnikh also observed blood smears on the ground and abrasions on the backs of both victims consistent with the bodies having been dragged by the feet across pavement and into a grassy area. Thereafter, Dr. Volnikh performed the autopsies of Canady and Singleton. Both victims suffered numerous incised wounds, blunt force trauma to the head, and defensive wounds. The cause of death for Canady was determined to be an incised wound to the neck that severed her carotid artery and jugular veins. The cause of death for Singleton was determined to be a sharp force injury to the neck and an incised wound to the neck that severed her carotid artery and jugular veins. According to Dr. Volnikh, the knife found in Pasha's van was consistent with having caused the stabbing and slicing injuries of the victims and the tire thumper found in Pasha's van was consistent with having caused the blunt force trauma injuries of the victims. Dr. Volnikh concluded that the victims were alive when the injuries were inflicted.

Pasha represented himself and testified at trial. Pasha testified that on August 23, 2002, he visited his ex-wife to drop off an alimony check and then

proceeded to drive home. According to Pasha, Canady called him and convinced him to come to the WCC to help her find a lost ring. Pasha claimed that when he arrived at the WCC, he met Canady in a parking lot to the west of a nearby cul-de-sac. Pasha claimed that Canady told him she had not lost a ring, needed him to act as a lookout while she did something to get money to support her family, and asked him to put on the white jumpsuit and boots because his clothes and shoes were expensive. Pasha testified that Canady told him to wait in the parking lot until she came back to get him or signaled him for help with her vehicle's lights or horn.

Pasha testified that, after waiting in the parking lot for approximately fifteen to twenty minutes, he walked to the nearby cul-de-sac and found the bodies of Canady and Singleton. According to Pasha, after holding both bodies, he ran around the WCC looking for someone, picked up a tire thumper, and returned to his van. Pasha stated that he saw a group of people sitting at a table and observed a truck following him as he walked towards his van. Pasha testified that he went between some buildings, took off his jumpsuit, walked to his van, and placed the jumpsuit, tire thumper, and boots in the back of the van. Pasha explained that he wrapped the tire thumper in his white jumpsuit, placed both items in his white boots, and began to drive away from the WCC without putting on his shirt or shoes. Soon thereafter, Pasha was stopped by the police at a nearby stoplight.

On cross-examination, Pasha acknowledged that after arriving at the WCC, he approached Canady's vehicle in a white jumpsuit and sat in the backseat of the vehicle behind Canady. Pasha admitted that he was still sitting in Canady's vehicle when Singleton arrived. Although Pasha claimed that he did not observe a knife at the crime scene, he testified that he had previously taken the same knife found at the crime scene out of a flower bed at his home, used it to remove a fuse from Canady's vehicle, and left it on the floorboard of the vehicle two or three days before the murder. Pasha testified that he found the tire thumper in the road south of Canady's vehicle and "took it because I thought it was a murder weapon." Pasha claimed that he did not know how the knife ended up in the back of his van, despite the fact that it was found in one of his boots. Pasha claimed that the police officers could not have seen the bloody objects concealed within one of his boots from outside of the van when they approached at the red light. Pasha admitted that he had lied to the police about killing a rabbit in order to explain the blood on his white t-shirt. When asked whether the blood of Canady and Singleton was on his jumpsuit, Pasha responded that "[o]bviously it was, yeah."

The jury found Pasha guilty as charged on both counts of first-degree murder. During the penalty phase, the State presented evidence that it would have taken a significant period of time to inflict the injuries on Canady and Singleton, the victims struggled with their attacker, the injuries would have been very painful,

and the victims remained conscious long enough after their throats were cut to exit the vehicle. The State also presented evidence that Pasha had been on parole since 1997 as a result of a 1970 conviction for bank robbery from the Western District of Kentucky, and that Pasha was convicted for robbing a bank in Indiana on March 27, 1984. Pasha called family members, friends, coworkers, and others to testify in mitigation. The jury recommended that Pasha be sentenced to death for each murder by a vote of eleven to one.

After the Spencer[3] hearing, the trial court[4] sentenced Pasha to death for each murder. In imposing the death sentences, the trial court concluded that the four aggravating factors[5] substantially outweighed the two statutory mitigators and eleven nonstatutory mitigators.[6] In its sentencing order, the trial court stated that it

---

3. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

4. Judge Fernandez—the trial court—presided over Pasha's case subsequent to Judge Fuente and Judge Tharpe.

5. The trial court concluded that the following four aggravating factors were proven beyond a reasonable doubt: (1) Pasha had committed a prior violent felony, based on Pasha's conviction for the contemporaneous murders of Canady and Singleton and the 1984 bank robbery—great weight and significant weight, respectively; (2) the murders were cold, calculated, and premeditated (CCP)—significant weight; (3) the murders were heinous, atrocious, or cruel (HAC)—great weight; and (4) Pasha committed the murders while on parole and under a sentence of imprisonment—significant weight. We note that neither party raised any doubling issue regarding the weighing of the prior violent felony aggravator.

6. The trial court found two statutory mitigators: (1) the age of Pasha at the time of the murders—slight weight and (2) extreme mental or emotional disturbance—moderate weight. The trial court also found that Pasha established

would still have sentenced Pasha to death even if it had not found CCP because "the remaining three (3) aggravators would seriously outweigh the existing mitigating circumstances."

## ANALYSIS

On appeal, Pasha raises thirteen issues: (1) the trial court violated his right to self-representation, due process, and a speedy trial, and erred in denying his motion for disqualification; (2) the trial court erred in denying his motion to suppress; (3) Judge Fuente erred in reappointing Attorney Daniel Hernandez as Pasha's standby counsel and in ordering Pasha to communicate through Hernandez, and the trial court erred in denying Pasha's motions regarding the dismissal of Hernandez; (4) the trial court erred in admitting the 911 recording and distributing the transcript of the recording to the jurors; (5) the trial court erred in denying his request for a standard alibi instruction; (6) the trial court erred when it impressed on the jurors during the guilt phase the need to reconvene later for a penalty phase; (7) the trial court erred in admitting photographs of the victims that were not relevant to a disputed issue; (8) the trial court made other erroneous evidentiary rulings that individually and collectively served to deprive him of a fair trial; (9) the prosecutor's comments during the guilt and penalty phases deprived him of a fair

eleven nonstatutory mitigating circumstances and accorded each slight or moderate weight.

trial; (10) the CCP aggravating factor was barred by double jeopardy; (11) the trial court erred in instructing the jury on two aggravating circumstances; (12) the trial court improperly utilized the Tedder[7] standard in deciding to impose the death sentences; and (13) the Florida death penalty statute, on its face and as applied, violates Ring v. Arizona, 536 U.S. 584 (2002).

Because we determine that Pasha is entitled to a new penalty phase based on Hurst, we address only Pasha's guilt phase claims and none of the other penalty phase claims. In addition, we address whether the evidence in this case was sufficient to sustain Pasha's first-degree murder convictions, which this Court is independently obligated to review in death penalty cases.

## I. Self-Representation and Due Process, Speedy Trial, Demand for Speedy Trial and Related Motions, and Motion for Disqualification

On October 24, 2012, Pasha filed a demand for speedy trial. On November 7, 2012, the trial court conducted a Faretta[8] inquiry and continued to permit Pasha to proceed pro se. On November 19, 2012, a hearing was held at which the trial court offered to appoint counsel for Pasha. At the hearing, the following exchange occurred in which the trial court explained to Pasha that it would permit Hernandez

---

7. Tedder v. State, 322 So. 2d 908 (Fla. 1975).

8. Faretta v. California, 422 U.S. 806 (1975).

to relitigate any of the motions that Pasha had filed, and the trial court had ruled

on, if Pasha agreed to the offer of counsel:

> THE COURT: Do you want me to appoint an attorney to represent you so that you can re-litigate any motions that you filed?
>     You would end up -- your attorney would be representing you, though. I'm telling you that. I'm making these offers to you, Mr. Pasha, because this is the last time that I'm going to see you before I see you when we're picking a jury on November 26th. We're set for jury selection November 26th, at 8:00, and this is the last time I'm going to see you before the jury walks in.
> THE DEFENDANT: Yeah, I know. I understand.
> THE COURT: So I really want to give you an opportunity to rethink your position about trying to represent yourself.
> THE DEFENDANT: You going to appoint Danny Hernandez as my attorney?
> THE COURT: He's your standby counsel. Yes. . . . I will allow Mr. Hernandez to represent you. I will allow Mr. Hernandez to refile and re-litigate any of the motions that you filed in the past that I've already ruled on because he's more experienced in my opinion. He's a more experienced attorney than you are because you haven't been to law school yet, and you don't have a law degree. So I will offer that to you.
>     I mean, obviously, we can't have a trial on Monday if Mr. Hernandez is going to re-litigate all of these motions because I know that he's going -- he's going to want some time to review the motions.
>     I'm doing this, Mr. Pasha, because honestly, this is the last time I'm going to see you [before trial].
>         . . . .
>
> THE COURT: I think the clerk has just handed me two additional motions that you filed. And again before we go through these motions, you do not want me to appoint Mr. Hernandez to represent you on these, either; is that correct?
> THE DEFENDANT: No.
> THE COURT: Again, any of the motions that you previously filed, I'm willing to allow Mr. Hernandez, if you want him to represent you, I would allow him to re-litigate them, which means I would allow him

to refile and reargue any of the motions that you previously filed in front of me.

Do you want Mr. Hernandez to represent you? I'm asking you for a third time because I'm getting ready to rule.

After conferring privately with Hernandez, Pasha requested counsel be appointed, took a continuance, and withdrew his speedy trial demand. The trial court granted Pasha's request and appointed Hernandez. The trial court explained the reasoning behind its offer of counsel as follows:

> THE COURT: Mr. Pasha, it's not my intention to prolong your case. I mean, when you demanded speedy trial, I ordered 200 jurors to show up Monday so that we could begin jury selection. And it was my intention of trying your case for the next three weeks. It is not my intention to prolong your case or delay your case.
>
> On the same side, on the same token, I want to balance that desire to give you efficient and effective justice. I want to balance that with the fact that I want to make sure that you understand what you're doing and [for] you [to] make very thoughtful judgments and [for] you [to] make very -- [to] exercise good thought and good judgment. And so that's why I offered again [to appoint Mr. Hernandez as counsel].

On November 30, 2012, Pasha filed a motion to proceed pro se and a pleading he entitled "Motion to Be Heard." Pasha claimed that he was "hoodwinked" by the trial court's offer and the offer forced him to make a choice between the right to be heard and the right to continue pro se, and he requested that his case be set for trial within the recapture window of the original demand filed on October 24, 2012.

On December 7, 2012, a hearing was held at which the trial court addressed Pasha's motions. The trial court regarded Pasha's "Motion to Be Heard" as an entirely new demand for speedy trial and noted that "there is no continuation of the initial speedy trial [demand filed on October 24, 2012,] because [Pasha] withdrew that motion the last time that we were here [on November 19, 2012]." Although Pasha insisted that he had been coerced into accepting Hernandez as counsel, the trial court rejected that coercion argument. The trial court set jury selection for January 14, 2013, within the required timeframe of Pasha's new demand for speedy trial.

On December 17, 2012, Pasha filed a notice of expiration of speedy trial time and a motion to disqualify the trial court on the basis that the trial court was no longer fair and impartial. The trial court ruled on the truth of the facts alleged in support of Pasha's motion to disqualify and denied the motion. On January 2, 2013, Pasha moved for discharge claiming a speedy trial violation. On January 3, 2013, the trial court struck the notice of expiration and denied the motion for discharge because Pasha's initial demand had been withdrawn and the trial court had treated Pasha's November 30, 2012, "Motion to Be Heard" as a new demand for speedy trial. In the words of the trial court, "the time for speedy trial ha[d] not yet expired."

## A.  Self-Representation and Due Process

- 14 -

Pasha asserts that the trial court's offer of counsel at the hearing held on November 19, 2012, violated his Sixth Amendment right to self-representation under Faretta v. California, 422 U.S. 806 (1975). In Faretta, the Supreme Court held that "a defendant in a state criminal trial has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so." Id. at 807. The Supreme Court explained that "[t]o force a lawyer on a defendant can only lead him to believe that the law contrives against him." Id. at 834 (emphasis added). Faretta does not address whether a trial court can offer a procedural benefit to a defendant that necessarily requires the defendant to waive his or her Sixth Amendment right to self-representation.

Pasha correctly notes that the trial court's offer of counsel on November 19, 2012, simultaneously included a procedural benefit: permitting Hernandez to refile and relitigate Pasha's previously denied motions. However, contrary to Pasha's assertion, the trial court's offer did not violate his Sixth Amendment right to self-representation because the trial court did not force Pasha against his will to accept Hernandez as counsel. See id. at 807, 835-36 (recognizing that when a defendant voluntarily, intelligently, and unequivocally elects to proceed without counsel under the Sixth Amendment, a court cannot force the defendant to accept counsel against his or her will). Rather, the record reflects that the trial court offered counsel to Pasha and Pasha accepted.

In fact, the record reflects that the trial court fully respected Pasha's Sixth Amendment rights by permitting Pasha to waive his right to self-representation from November 19, 2012, to December 7, 2012, permitting Pasha to reassert his right to self-representation on December 7, 2012, and permitting Pasha to represent himself at trial. Since the trial court never denied Pasha's constitutional right to self-representation, Pasha is not entitled to relief.

Pasha also asserts that the trial court's offer of counsel violated his right to due process by inducing him to waive his right to proceed pro se. However, as the Supreme Court has recognized, "not every burden on the exercise of a constitutional right, and not every pressure or encouragement to waive such a right, is invalid." Corbitt v. New Jersey, 439 U.S. 212, 218 (1978). Although a trial court's offer of counsel that simultaneously contains a procedural benefit may raise concerns about safeguarding a defendant's right to due process in some circumstances, no cause for concern exists under the facts of this case. First, the record reflects that the trial court had previously considered and ruled on each of the motions in question—thus, the trial court's offer did not require Pasha to give up any right, privilege, or advantage regarding the motions. Second, any procedural benefit obtained by Pasha would have required the prosecutor to relitigate motions that previously favored the State—thus, only the State stood the risk of receiving an unfavorable ruling on the motions. And third, Pasha waived

his right to self-representation from November 19, 2012, to December 7, 2012, Pasha reasserted his right to self-representation on December 7, 2012, and Pasha subsequently represented himself at trial. Accordingly, under the facts of this case, the trial court's offer of counsel did not violate Pasha's right to due process. Pasha further claims that the trial court's offer of counsel violated public policy and constituted fraud in the inducement. We reject these claims as they are unsupported by the record and without merit.

## B. Speedy Trial

Pasha claims that he was denied his Sixth Amendment right to speedy trial because the trial court and the prosecutor allegedly acted in bad faith and official bad faith is purportedly demonstrated on the record. When determining whether a defendant has been deprived of the constitutional right to speedy trial, courts balance the following four factors: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. Barker v. Wingo, 407 U.S. 514, 530 (1972). Official bad faith in causing a delay "will be weighed heavily against the government" and "make relief virtually automatic." Doggett v. United States, 505 U.S. 647, 656-57 (1992).

We find that Pasha was not deprived of his constitutional right to speedy trial under the balancing test established in Barker. First, less than three years elapsed between the issuance of this Court's mandate in 2010 ordering a retrial and

the beginning of Pasha's retrial in 2013. Second, much of that time was spent with Pasha filing motions and seeking to relitigate issues. Third, Pasha did not begin to assert his right to speedy trial until October 24, 2012, less than three months before his retrial started, and then did so only under Florida's procedural speedy trial rule. And fourth, nothing within the record suggests that Pasha was prejudiced by any delay. Contrary to Pasha's assertion, neither the trial court nor the prosecutor acted in bad faith and no official bad faith is demonstrated on the record.

### C. Demand for Speedy Trial and Related Motions

Pasha asserts that the trial court erred in striking the notice of expiration of speedy trial time filed on December 17, 2012, and denying the motion for discharge filed on January 2, 2013. We reject these claims because we find that Pasha took a valid continuance on November 19, 2012, and Pasha's appellate counsel conceded at oral argument before this Court that a valid continuance renders these arguments moot.

### D. Motion for Disqualification

Within his motion for disqualification filed on December 17, 2012, Pasha asserted that the trial court held a hearing without his presence on September 21, 2012, coerced Pasha to accept Hernandez as counsel on November 19, 2012, and abrogated her role as a neutral arbitrator on December 7, 2012. "A motion to disqualify shall be filed within a reasonable time not to exceed 10 days after

- 18 -

discovery of the facts constituting the grounds for the motion and shall be promptly presented to the court for an immediate ruling." Fla. R. Jud. Admin. 2.330(e). A motion to disqualify shall show "that the party fears that he or she will not receive a fair trial or hearing because of specifically described prejudice or bias of the judge." Fla. R. Jud. Admin. 2.330(d)(1). "The judge against whom an initial motion to disqualify under subdivision (d)(1) is directed shall determine only the legal sufficiency of the motion and shall not pass on the truth of the facts alleged." Fla. R. Jud. Admin. 2.330(f). However, "[i]f a judge has been previously disqualified on motion for alleged prejudice or partiality under subdivision (d)(1), . . . a successor judge may rule on the truth of the facts alleged in support of the motion." Fla. R. Jud. Admin. 2.330(g). The denial of a motion to disqualify by a successor judge will only be reversed if the record clearly refutes the successor judge's decision to deny the motion. Kokal v. State, 901 So. 2d 766, 774 (Fla. 2005).

Irrespective of the timeliness of Pasha's motion under rule 2.330(e), the record does not clearly refute the trial court's decision—as a successor judge—to deny Pasha's motion for disqualification under Kokal. First, although the trial court initially began a hearing without Pasha in attendance on September 21, 2012, the record from the hearing reflects that the trial court, the State, and standby counsel simply engaged in administrative discussions until the trial court called

- 19 -

Pasha into the courtroom.  See, e.g., Florida Bar v. Carlon, 820 So. 2d 891, 896 (Fla. 2002) (recognizing that ex parte communications regarding strictly administrative matters are not sufficient to grant a motion to disqualify a judge).  At no point during Pasha's absence from the hearing did the trial court, the State, or standby counsel discuss any matter dealing with the merits of the case.  Second, the record from the hearing held on November 19, 2012, reflects that the trial court did not coerce Pasha to accept Hernandez as counsel.  And third, the record from the hearing held on December 7, 2012, reflects that the trial court did not abrogate its role as a neutral arbitrator.  Accordingly, the trial court did not err in denying Pasha's motion for disqualification.

## II.  Motion to Suppress

Pasha contends that the trial court erred in denying his motion to suppress and concluding that Pasha's stop, detention, and arrest were lawful.  "The standard of review for motions to suppress is that the appellate court affords a presumption of correctness to a trial [court's] findings of fact but reviews de novo the mixed questions of law and fact . . . ."  Wyche v. State, 987 So. 2d 23, 25 (Fla. 2008).  In order to perform an investigative stop, an officer must have "reasonable suspicion that the person is engaged in criminal activity."  J.L. v. State, 727 So. 2d 204, 206 (Fla. 1998).  The reasonable suspicion standard for investigative stops "takes into account 'the totality of the circumstances—the whole picture.' "  Navarette v.

California, 134 S. Ct. 1683, 1687 (2014) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). "The 'reasonable suspicion' necessary to justify such a stop 'is dependent upon both the content of information possessed by police and its degree of reliability.' " Id. (quoting Alabama v. White, 496 U.S. 325, 330 (1990)).

An informant's reliability, basis of knowledge, and veracity are relevant factors to consider in the reasonable suspicion context. White, 496 U.S. at 328. "Anonymous tips are at the low-end of the reliability scale" while information provided by a citizen-informant "is at the high end of the tip-reliability scale." State v. Maynard, 783 So. 2d 226, 229-30 (Fla. 2001) (quoting State v. Evans, 692 So. 2d 216, 218-19 (Fla. 4th DCA 1997)). "[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity . . . ." White, 496 U.S. at 329. However, "if the caller qualifies as a citizen informant, then the information from the tip . . . would be considered at the high end of the reliability scale, sufficient by itself to justify a[n investigative] stop." Maynard, 783 So. 2d at 228.

At the hearing held on Pasha's motion to suppress, Hillsborough County Sheriff Deputies Stahlschmidt and Mason testified about the stop of Pasha's vehicle. According to Deputy Stahlschmidt:

> The information that we received [from the 911 dispatcher] as annotated in my report was suspicious person in a vehicle. The subject that emerged from the woodline had gone through the park and appeared to be covered in blood and holding an unknown object,

- 21 -

possibly a knife, and entering a van at a different location. . . . It was a white cargo-style Ford E150 van bearing a Florida [license plate] U[*****]. . . . He was changing his clothes and he had thrown something in the woods there . . . and taken off what he was wearing at that point.

According to Deputy Mason:

[Prior to the stop,] [w]e knew that there were two witnesses that observed an individual that were now following the individual. They relayed that the individual entered into a white van. They gave the [license plate] number of the van. And then they also provided information to the [dispatcher] that they were following the van. . . . [T]he information that was given to us was that they observed a black male running through the woods in a white suit that appeared to be covered in blood.

On cross-examination, Pasha elicited from Deputy Stahlschmidt that the dispatcher was not a law enforcement officer or trained professional.

The deputies testified that, upon nearing the WCC, they observed a white van stopped at a red light followed by a red pickup truck with two occupants inside. The driver of the truck was flashing his headlights at the deputies and both the driver and his passenger were "kind of hanging out of both sides of the vehicle waving at [the deputies] and pointing at the van with hand gestures." "Based upon the nature of the occupant[s] of the [red] pickup truck matching the description that was given to [the deputies by the 911 dispatcher]," the deputies performed a U-turn, pulled directly behind the white van, confirmed the license plate number that was given by the 911 dispatcher, activated their police lights, and approached the van on foot. According to Deputy Stahlschmidt, "[b]ased on the totality of the

circumstances and all the information I received, including the fact that [the Sanchezes] were flagging the van down and flashing their headlights is why the van was stopped."

Deputy Stahlschmidt asked Pasha, the driver of the white van, to step out of the vehicle after Deputy Stahlschmidt observed drops of blood on Pasha's white t-shirt, Deputy Mason observed a bloody jumpsuit through the rear window of the van, and Deputy Mason signaled to Deputy Stahlschmidt to use caution. Other deputies arrived soon thereafter and the occupants of the red pickup truck, the Sanchezes, led Deputy Stahlschmidt and Deputy Mason into the WCC where they claimed to have seen Pasha. Within the WCC, the deputies discovered bloody items, pools of blood, a bloody vehicle, and the bodies of Canady and Singleton.

Pasha initially claims that Deputy Stahlschmidt and Deputy Mason lacked reasonable suspicion to justify the investigative stop of Pasha's vehicle because the information provided by the Sanchezes to the 911 dispatcher failed to provide the deputies with reasonable suspicion of ongoing or completed criminal activity. We disagree. The record reflects that the deputies received information from a 911 dispatcher that two witnesses had called 911 to report a man covered in blood, holding a knife-like object, running, changing clothes, throwing something into the woods, and leaving the WCC in a white cargo-style Ford E150 van bearing a

specific Florida license plate number.  This information provided the deputies with reasonable suspicion of ongoing or completed criminal activity within the WCC.

Pasha further claims that the Sanchezes were anonymous informants whose anonymous tip required further police investigation.  We disagree.  Approximately one minute after receiving the dispatch, the deputies were flagged down by a red pickup truck at a stoplight near the WCC.  The occupants of the red pickup truck were yelling, pointing, and flashing their headlights at a white van—the exact same van identified by license plate number within the dispatch—in order to direct the deputies' attention towards the van.  We find that the Sanchezes were not anonymous because they called 911 to report suspected ongoing or completed criminal activity within the WCC, told the 911 dispatcher that they were following Pasha's vehicle, and flagged down two deputies at a nearby stoplight.  Even considering only the facts known to the deputies at the time of the investigative stop of Pasha's vehicle, the Sanchezes' identities were easily ascertainable and readily discoverable.  See Maynard, 783 So. 2d at 229-30.  Moreover, the Sanchezes qualified as citizen-informants.  There is no indication that the Sanchezes were motivated by any reason other than a concern for the safety of others.  See id. at 230.

Under the totality of the circumstances, the facts known to the deputies immediately prior to the investigatory stop of Pasha's van provided them with an

objectively reasonable basis to justify the stop. Therefore, the trial court did not err in denying Pasha's motion to suppress because the investigative stop was permissible under the Fourth Amendment.

Pasha claims that even if the deputies had reasonable suspicion to justify the stop, the deputies violated the Fourth Amendment by detaining Pasha longer than necessary. We reject this claim as it is without merit and unsupported by the record. Pasha also argues for the first time on appeal that the information given by Mrs. Sanchez to the 911 dispatcher cannot be imputed to the officers who made the stop under the fellow officer rule because the dispatcher in this case was a civilian employee rather than a law enforcement officer. However, because Pasha did not raise this argument below, he is foreclosed from raising it here. See Reynolds v. State, 934 So. 2d 1128, 1144 (Fla. 2006) ("[W]e note that this particular claim was not presented at the trial court level, and, therefore, the claim has not been properly preserved for review.").

### III. Standby Counsel

### A. Reappointment of Standby Counsel

Pasha claims that Judge Fuente erred in reappointing Hernandez as Pasha's standby counsel after this Court's remand for a new trial in 2010 because Judge Tharpe's prior order granting Pasha's motion to discharge Hernandez allegedly served as a factual finding that a conflict of interest existed. However, the record

indicates otherwise. Pasha had alleged a "conflict" with Hernandez, claimed that Hernandez had attempted to hide exculpatory evidence, and expressed a lack of confidence in Hernandez. But Judge Tharpe discharged Hernandez without making any finding of a conflict of interest within his order dated January 26, 2006. Additionally, Judge Tharpe did not make any finding of a conflict of interest during the hearing held on Pasha's motion on September 8, 2005. Pasha alternatively argues that Judge Tharpe's order implicitly found that a conflict of interest existed. We reject this claim. From the record, it is apparent that Hernandez was discharged as standby cocounsel simply because Pasha had made clear that he did not wish to consult with him. Since Hernandez was not removed for cause in 2006 by Judge Tharpe, Judge Fuente did not err by reappointing Hernandez to Pasha's case in 2010.

Pasha claims that Hernandez had a duty to decline being reappointed as Pasha's standby counsel by Judge Fuente. This claim lacks merit because Hernandez was not removed for cause by Judge Tharpe. Pasha further claims that Hernandez had an ethical duty to inform Judge Fuente of his prior involvement in the case. This claim also lacks merit because, even if true, Judge Fuente was still within his discretion to appoint Hernandez as standby counsel. We reject Pasha's claim that a conflict of interest arose because he filed a Florida Bar complaint

against Hernandez. See Hutchinson v. State, 17 So. 3d 696, 703-04 (Fla. 2009) ("[T]he filing of a Bar complaint does not per se constitute a conflict of interest.").

## B. Communicating Through Standby Counsel

Pasha claims that Judge Fuente erroneously stated in an order dated October 12, 2011, that "[t]he [c]ourt will communicate with Mr. Pasha through Mr. Hernandez and the assigned prosecutor." However, when this isolated statement is considered within the full context of Judge Fuente's subsequent actions, any error in the order was harmless beyond a reasonable doubt. For example, at the very next hearing held on October 14, 2011, Judge Fuente communicated directly with Pasha without requiring him to communicate through Hernandez or the assigned prosecutor and set a hearing on one of Pasha's motions. Accordingly, there is no reasonable possibility that any error in Judge Fuente's order affected Pasha's right of self-representation.

## C. Dismissal of Standby Counsel

Pasha claims that the trial court erred in: (1) declining to reconsider Judge Fuente's order dated October 12, 2011, denying Pasha's motion to dismiss Hernandez and (2) denying Pasha's motions to dismiss Hernandez as standby counsel. "The general rule is that an indigent defendant has no right to choose a particular court-appointed attorney." Weaver v. State, 894 So. 2d 178, 187 (Fla. 2004). "Thus, if a trial court decides that court-appointed counsel is providing

adequate representation, the court does not violate an indigent defendant's Sixth Amendment rights if it requires him to keep the original court-appointed lawyer or represent himself." Id. at 188.

"[W]hen a defendant complains that his appointed counsel is incompetent[,] . . . the trial judge is required to make a sufficient inquiry of the defendant [under Nelson v. State, 274 So. 2d 256 (Fla. 4th DCA 1973),] to determine whether or not appointed counsel is rendering effective assistance to the defendant." Morrison v. State, 818 So. 2d 432, 440 (Fla. 2002). "This Court has consistently found a Nelson hearing unwarranted where a defendant presents general complaints about defense counsel's trial strategy and no formal allegations of incompetence have been made." Id. "Similarly, a trial court does not err in failing to conduct a Nelson inquiry where the defendant merely expresses dissatisfaction with his attorney." Id. "A trial court's decision involving withdrawal or discharge of counsel is subject to review for abuse of discretion." Guardado v. State, 965 So. 2d 108, 113 (Fla. 2007).

We find that the trial court did not abuse its discretion in denying Pasha's motion to reconsider and denying Pasha's motions to dismiss Hernandez. The record from the hearing held on Pasha's motion to reconsider reflects that the motion was denied after the trial court conducted a Nelson inquiry at which Pasha presented no grounds to question Hernandez's competence. With regard to

- 28 -

Pasha's numerous motions to dismiss Hernandez and the hearings held on those motions, the record reflects that the trial court either made sufficient inquiry to determine whether there was reasonable cause to believe that standby counsel was not rendering effective assistance or that Pasha's complaints regarding standby counsel merely expressed his general dissatisfaction with Hernandez.

## IV.  911 Recording and Transcript

### A.  Hearsay

Pasha claims that the trial court erred in admitting the recording of Mrs. Sanchez's 911 call under the excited utterance exception to the hearsay rule.  "A trial court's decision to admit evidence is reviewed under an abuse of discretion standard."  Davis v. State, 121 So. 3d 462, 481 (Fla. 2013).  "That discretion, however, is limited by the rules of evidence."  Hudson v. State, 992 So. 2d 96, 107 (Fla. 2008).  "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  § 90.801(1)(c), Fla. Stat (2012).  The excited utterance exception authorizes admission of hearsay containing "[a] statement or excited utterance relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  § 90.803(2), Fla. Stat (2012).  "[T]o qualify as an excited utterance, the statement must be made: (1) 'regarding an event startling enough to cause nervous excitement'; (2)

'before there was time to contrive or misrepresent'; and (3) 'while the person was under the stress or excitement caused by the event.' " Hudson, 992 So. 2d at 107 (quoting Henyard v. State, 689 So. 2d 239, 251 (Fla. 1996)). "This Court has observed that '[i]f the statement occurs while the exciting event is still in progress, courts have little difficulty finding that the excitement prompted the statement.' " Id. (alteration in original) (quoting State v. Jano, 524 So. 2d 660, 662 (Fla. 1988)).

Pasha argues that the 911 recording constituted inadmissible hearsay to which the excited utterance exception does not apply because Mrs. Sanchez testified at trial that she was not "excited" when she made the 911 call. Nevertheless, Mrs. Sanchez's statement to the 911 dispatcher meets the legal definition of an excited utterance. First, Mrs. Sanchez made the statement while she observed Pasha covered in blood, holding a knife-like object, and running around the WCC. Certainly, this event was startling enough to cause Mrs. Sanchez to experience nervous excitement. Second, because Mrs. Sanchez made the statement while contemporaneously observing Pasha covered in blood and carrying a knife-like object, there was little to no time for her to contrive or misrepresent what she observed. And third, Mrs. Sanchez made the statement while under the excitement caused by observing Pasha covered in blood and carrying a knife-like object. In fact, notwithstanding her disavowal of being "excited," Mrs. Sanchez

testified at trial that she was afraid, scared, nervous, and concerned when she saw Pasha covered in blood and called 911.

We acknowledge that the circumstances here—in which the declarant's utterance was made contemporaneously with the events described—may fit more neatly under the exception in section 90.803(1), Florida Statutes, for spontaneous statements, which covers statements "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter, except when such statement is made under circumstances that indicate its lack of trustworthiness."[9] In any event, Pasha's argument that there was an abuse of discretion on this point is unavailing.

Pasha claims that the 911 recording constituted hearsay within hearsay to which the excited utterance exception does not apply because Mrs. Sanchez relayed to the 911 dispatcher the observations of Mr. Sanchez. However, this issue is not preserved for review because Pasha failed to contemporaneously make this

---

9. See Charles W. Ehrhardt, Ehrhardt's Florida Evidence § 803.2, at 1028 (2016 ed.) ("In many situations, the spontaneous statement exception and the excited utterance exception overlap. The two exceptions differ in the amount of time that may lapse between the event and the statement describing the event. Under section 90.803(2) it is not necessary that there be contemporaneity between the event and the statement. Under section 90.803(2) the statement must only relate to the event causing the excitement. Section 90.803(1) is limited to statements that describe or explain the event. In addition, an exciting event or condition is not required for a spontaneous statement under section 90.803(1)." (footnotes omitted)).

specific objection at trial.  See Jackson v. State, 983 So. 2d 562, 568 (Fla. 2008) (explaining that in order to preserve error for appellate review, the general rule is a contemporaneous, specific objection must occur during trial at the time of the alleged error).  Pasha also argues that the introduction to the 911 recording constituted inadmissible hearsay not subject to an exception.  The introduction to the 911 recording stated: "The following is a recording of a call received at Hillsborough County Sheriff's Office on 8/23/2002, on or about 2321 hours, reference Hillsborough County Case No. 02-081848.  Event number is 3585.  Original signal code 050.  Call location from 4502 Seedling Circle."  However, the introduction to the recording was not a hearsay statement offered for its truth.  The introduction was simply offered to orient the jury to the nature of the recording that followed.

Pasha raises additional arguments related to the authentication of the 911 recording and the transcript of the recording, but none of them were preserved.

### B.  Sixth Amendment Right of Confrontation

Pasha claims that this Court must reverse because he was denied his constitutional right to confront the person who made the introduction to the 911 recording and transcript of the recording.  In Crawford v. Washington, 541 U.S. 36, 68 (2004), the Supreme Court held that "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required:

unavailability and a prior opportunity for cross-examination." In other words, "testimonial hearsay that is introduced against a defendant violates the Confrontation Clause unless the declarant is unavailable and the defendant had a prior meaningful opportunity to cross-examine that witness." State v. Johnson, 982 So. 2d 672, 675 (Fla. 2008). Since Crawford, "this Court has held that a specific objection is necessary to preserve a Crawford challenge." Williams v. State, 967 So. 2d 735, 747 n.11 (Fla. 2007). Although a defendant need not intone special "magic words" in order to preserve a Crawford claim, "an objection to an out-of-court statement as inadmissible hearsay will not preserve the Crawford issue." Corona v. State, 64 So. 3d 1232, 1242 (Fla. 2011).

Pasha claims that the introduction to the 911 recording and transcript constituted testimonial hearsay because it was produced by law enforcement in anticipation of litigation. However, this issue is not preserved for review because Pasha never made a specific objection that the admission of the recording or the transcript would violate the Confrontation Clause. Moreover, Pasha's hearsay objection did not preserve the issue for review.

### C. The McCoy[10] Mandates

---

10. McCoy v. State, 853 So. 2d 396 (Fla. 2003).

Pasha claims that the trial court erred in failing to make an independent pretrial determination of the accuracy of the transcript of the 911 recording and in failing to give a cautionary instruction to the jury regarding the use of the transcript. In McCoy, this Court instructed trial courts to adhere to the guidance promulgated in Martinez v. State, 761 So. 2d 1074 (Fla. 2000), regarding the use of transcripts at trial. Specifically, this Court "mandate[d] that trial courts make an independent pretrial determination of the accuracy of transcripts, and give a cautionary instruction to the jury regarding the limited use to be made of the transcript, prior to employment of these demonstrative aids during trial." McCoy, 853 So. 2d at 405. A trial court abuses its discretion when it fails to follow the McCoy mandates. Davis, 121 So. 3d at 491.

The claim that the trial court failed to make an independent pretrial determination of the accuracy of the transcript is preserved for review because Pasha argued in his motion to suppress that the transcript was "altered," and this claim is fairly equivalent to a claim that the transcript is not "accurate." See Wilcox v. State, 143 So. 3d 359, 373 (Fla. 2014) (recognizing that courts generally afford pro se litigants leniency in technical matters). However, we find that any error in the distribution of the transcript to the jury was harmless beyond a reasonable doubt because the transcript was cumulative to the testimony provided at trial by Mr. and Mrs. Sanchez regarding Pasha's appearance and movements

within the WCC.  In fact, both Mr. and Mrs. Sanchez testified at trial that Pasha was the individual that they identified within the 911 call.  Furthermore, Pasha was not prohibited from cross-examining Mr. and Mrs. Sanchez regarding the contents of the transcript, all copies of the transcript were collected from the jurors after the 911 call was played, and the transcript was not provided to the jury during deliberations.  And Pasha has failed to identify any inaccuracies in the transcript. Under these circumstances, there is no reasonable possibility that the distribution of the transcript affected the verdict.

The claim that the trial court failed to give a cautionary instruction to the jury is not preserved for review because Pasha failed to request a cautionary instruction at trial, and "the failure to give such an instruction would not rise to the level of fundamental error." Martinez, 761 So. 2d at 1088.

### V.  Alibi Jury Instruction

Pasha claims that the trial court erred in denying his request for an alibi jury instruction.  According to Pasha, he was entitled to the standard alibi instruction because he testified at trial that he was elsewhere when the murders of Canady and Singleton occurred:

> And I went to the area of -- the west end.  It would be the west end of Seedling Circle.  Seedling Circle is on the east side.  This is if you go west, you see that road.  There's a parking lot up there that you go off into -- up into, back of a pond and has a TV station all up in the corner.  So I went up there.

- 35 -

[Canady] said, [s]tay here.  Give me about 10 or 15 minutes.
She said, [i]f you see me blink my light or blow my horn and stuff,
she said, you come down here, just come down here.  Other than that,
just stay there; I'll be back to get you in just a second.  So I said, okay.
I just stood there and stood there and waited and waited.

As I stood there about 15, 20 minutes, I don't know how much
time it was.  I wasn't paying attention to exactly what time it was.  I
saw her walking back down to it. . . .

When I came close . . . to the cul-de-sac, I walked up and saw
my wife, Robin, laying on the ground, and I ran to her.  When I ran to
her, I kind of grabbed the body and intended to hold it, but before I
did, I heard something, voom, like kind of a noise like that.  I looked
at Raneesha laying on the other side of her.  I went to Raneesha, and I
picked her up, and I put my head on her chest to kind of see if she had
a heartbeat. . . .

I go back over to Robin and check her out, and they're both
dead.

The standard alibi jury instruction provides as follows: "An issue in this case

is whether defendant was present when the crime allegedly was committed.  If you

have a reasonable doubt that the defendant was present at the scene of the alleged

crime, it is your duty to find the defendant not guilty."  Fla. Std. Jury Instr. (Crim.)

3.6(i).

"The defense known in law as an 'alibi' is that, at the time of the

commission of the crime charged in the [information or] indictment, the defendant

was at a different place, so that he could not have committed it."  Blackwell v.

State, 86 So. 224, 227 (Fla. 1920) (quoting Words and Phrases 298 (Nat'l Rptr.

System ed., 1904)); accord Dees v. State, 128 So. 485, 485 (Fla. 1930); State ex

rel. Mitchell v. Walker, 294 So. 2d 124, 127 (Fla. 2d DCA 1974); Jones v. State, 128 So. 2d 754, 755 (Fla. 2d DCA 1961). "The proof of an alibi must include and cover the entire time when the presence of the accused was required to commit the offense charged." Murphy v. State, 12 So. 453, 454 (Fla. 1893); accord Caldwell v. State, 39 So. 188, 191 (Fla. 1905); Constantino v. State, 224 So. 2d 341, 342 (Fla. 3d DCA 1969); Jones, 128 So. 2d at 755. Contra Williams v. State, 395 So. 2d 1236, 1238 (Fla. 4th DCA 1981). Evidence in support of an alibi "must be such as to render it impossible that the crime could have been committed by the party that claims that he was not present, and could not be guilty as charged." Bacon v. State, 22 Fla. 51, 77 (1886) (emphasis added); see Blackwell, 86 So. at 227 (explaining that a defendant who sets up an alibi must show such a state of facts surrounding his whereabouts at that particular time as would make it practically improbable or impossible for him to have committed the offense charged); see also Commonwealth v. Roxberry, 602 A.2d 826, 828 (Pa. 1992) ("There is no minimum or threshold quantum of physical separation necessary for a defense to constitute an alibi, so long as the separation makes it impossible for the defendant to have committed the crime."); State v. Berry, 419 P.2d 337, 341 (Ariz. 1966) ("An alibi which leaves it possible for the accused to be the guilty man is no alibi at all . . . .") (alteration in original) (emphasis omitted) (quoting Singh v. State, 280 P. 672, 675 (Ariz. 1929)). In sum, an "alibi" is "[a] defense based on the physical

- 37 -

impossibility of a defendant's guilt by placing the defendant in a location other than the scene of the crime at the relevant time." Alibi, <u>Black's Law Dictionary</u> (10th ed. 2014).

We conclude that the trial court did not abuse its discretion in denying Pasha's request for an alibi jury instruction because Pasha did not present evidence to show that it would have been physically impossible for him to have committed the murders of Canady and Singleton. A fair reading of Pasha's trial testimony shows that it was a general denial of guilt rather than an alibi defense based on the physical impossibility of Pasha's guilt. Pasha testified that he spoke to Canady at the WCC, in person, a mere fifteen to twenty minutes prior to the murders. Significantly, Pasha testified that he remained in close proximity to Canady— within eyeshot and earshot of her vehicle's lights and horn—during the fifteen to twenty minutes in which he claims the murders took place. Pasha further testified that after waiting for fifteen to twenty minutes in the parking lot, he went to the cul-de-sac where he observed one of the victims making gasping noises. Accordingly, even if Pasha traveled to the parking lot and remained where he claimed, Pasha was not so far removed from the nearby cul-de-sac—the scene of the crimes—at the relevant time in which the murders could have taken place as to render it physically impossible for him to be the guilty party.

Pasha cites <u>Adams v. State</u>, 10 So. 106 (Fla. 1891), in support of the argument that he was entitled to an alibi jury instruction. To the extent that <u>Adams</u> states that "[n]either do we think that the evidence of an <u>alibi</u> should in any case make it absolutely impossible for the prisoner to be present at the killing," <u>Adams</u>, 10 So. at 114, it is inconsistent with our holding in this case and we recede from it to the extent of the inconsistency.

## VI. Trial Court's Comments During the Guilt Phase

Pasha argues on appeal that certain comments of the trial court made on January 14, 15, and 24, 2013, require reversal because they allegedly implied to the prospective jurors and jurors that the trial court expected a guilty verdict. Pasha claims that he properly preserved the issue for appellate review when he moved for a mistrial on January 25, 2013, told the trial court that he had "a complaint to lodge," and the trial court responded "your objection is noted for the record." We disagree. Although Pasha moved for a mistrial on January 25, he failed to contemporaneously object to any of the trial court's comments on January 14, 15, or 24, 2013. Accordingly, we conclude that Pasha failed to preserve this issue for appeal. <u>See, e.g.</u>, <u>Norton v. State</u>, 709 So. 2d 87, 94 (Fla. 1997) ("[D]espite appellant's motion for mistrial at the close of the witness's testimony, his failure to raise an appropriate objection at the time of the impermissible comment failed to adequately preserve the issue for appellate review.").

## VII. Photographs of the Victims

Pasha argues that the trial court abused its discretion in admitting morgue and crime scene photographs of the victims that were gruesome, gratuitous, and more prejudicial than probative as to guilt. "The standard of review for the admission of photographs is abuse of discretion." Doorbal v. State, 983 So. 2d 464, 497 (Fla. 2008). "[P]hotographs are admissible if they are relevant and not so shocking in nature as to defeat the value of their relevance." Jennings v. State, 123 So. 3d 1101, 1126 (Fla. 2013) (quoting Hertz v. State, 803 So. 2d 629, 641 (Fla. 2001)). "Crime scene photographs are considered relevant when they establish the manner in which the murder was committed, show the position and location of the victim when he or she is found by police, or assist crime scene technicians in explaining the condition of the crime scene when police arrived." Douglas v. State, 878 So. 2d 1246, 1255 (Fla. 2004). "This Court has upheld the admission of photographs where they are relevant to 'explain a medical examiner's testimony, to show the manner of death, the location of wounds, and the identity of the victim.' " Floyd v. State, 808 So. 2d 175, 184 (Fla. 2002) (quoting Larkins v. State, 655 So. 2d 95, 98 (Fla. 1995)).

Pasha argues that the photographs should not have been admitted at trial because he and the State stipulated to the identity of the victims. This issue is not preserved for review because Pasha failed to object at trial on the basis of this

stipulation.  Pasha claims that he preserved the issue of the admission of morgue and scene photographs through a motion in limine.  However, since the trial court never made a definitive ruling on the issue raised in the motion, Pasha was required to object at the time the photographs were introduced at trial.  See McGirth v. State, 48 So. 3d 777, 791 (Fla. 2010).  Pasha also claims that he preserved the issue of the admission of morgue and scene photographs with a contemporaneous objection at trial.  Although Pasha's objection preserved the issue of the admission of the morgue photographs, Pasha failed to preserve any issue with regards to the subsequent admission of the scene photographs.

The trial court did not abuse its discretion in admitting the morgue photographs of the victims.  The photographs were relevant to a number of disputed issues in the guilt phase including premeditation, the nature of the victims' injuries, the identity of the murder weapons, and the identity of the murderer.  Detective Service used the photographs to describe the injuries she observed on the victims and the items recovered from their bodies and Dr. Volnikh, the medical examiner that performed the autopsies of the victims, used the photographs to explain to the jury the nature and manner in which the victims' wounds were inflicted.

## VIII.  Other Evidentiary Rulings

- 41 -

Pasha claims that the trial court made other erroneous evidentiary rulings during the guilt phase that individually and cumulatively deprived him of a fair trial. Each of the evidentiary rulings is addressed below.

## A. Instructing a Witness

Pasha argues that the trial court improperly refused to instruct Mr. Sanchez to avoid nonresponsive answers. The record reflects that Pasha requested the trial court to admonish Mr. Sanchez on three occasions, the trial court granted one of Pasha's requests, and the trial court denied two of Pasha's requests. Accordingly, two of Pasha's requests for admonishment are preserved and properly before this Court. Nevertheless, the trial court did not abuse its discretion in denying those two requests and refusing to admonish Mr. Sanchez because Mr. Sanchez's answers were responsive to Pasha's questions. See Kormondy v. State, 845 So. 2d 41, 52 (Fla. 2003) (explaining that limitations on the examination of a particular witness are controlled in the sound discretion of the trial court). Pasha further alleges that the trial court's refusal to admonish Mr. Sanchez violated his right of cross-examination. However, this issue is not preserved for review because it was raised for the first time in Pasha's Reply Brief. See Johnson v. State, 135 So. 3d 1002, 1029 n.11 (Fla. 2014).

## B. Opinion Testimony

Pasha argues that the trial court erred in refusing to curtail improper opinion testimony from Mr. Sanchez regarding Pasha's guilt. However, this issue is not preserved for review because Pasha failed to contemporaneously make this specific objection at trial. Pasha also argues that the trial court erred in refusing to curtail improper opinion testimony from Mrs. Sanchez on the 911 call regarding Pasha's dangerousness. However, this issue is not preserved for review because Pasha failed to contemporaneously make this specific objection at trial. But even if the issue were preserved, Mrs. Sanchez's statement on the 911 recording that Pasha appeared to be "dangerous" did not provide an improper opinion regarding Pasha's guilt. Rather, Mrs. Sanchez's statement merely relayed to the 911 dispatcher what she perceived while observing Pasha covered in blood and holding a knife-like object.

## C. Leading Questions

Pasha argues that the trial court improperly overruled three of his objections to questions as leading during the direct and redirect examinations of Mr. and Mrs. Sanchez. However, the trial court did not abuse its discretion in overruling Pasha's objections. We reject these claims as they are without merit.

## D. Impeachment Evidence

Pasha claims that the trial court erred in ruling that he could only impeach Mr. Sanchez by admitting the entire transcript from a hearing held on October 29,

2007, rather than using a two-page excerpt. "Before a witness can be impeached with a prior inconsistent statement, the proper foundation must be laid." Pearce v. State, 880 So. 2d 561, 569 (Fla. 2004). Laying the proper foundation to impeach a witness with a prior inconsistent statement necessarily requires calling the witness's attention to the prior inconsistent statement. See § 90.614(2), Fla. Stat. (2012); Pearce, 880 So. 2d at 570 (explaining that defense counsel laid the proper foundation under section 90.614(2) by "call[ing] to [the witness's] attention the time, place, and person to whom [the witness] made the prior inconsistent statements, quot[ing] from the prior statements, and g[iving the witness] an opportunity to explain his prior statements.").

We find that Pasha was not entitled to admit the two-page excerpt of Mr. Sanchez's prior testimony from the hearing held on October 29, 2007, because Pasha failed to lay a proper foundation to impeach Mr. Sanchez with a prior inconsistent statement. The record reflects that Pasha called Mr. Sanchez's attention to a hearing held on October 29, 2007, and asked Mr. Sanchez a series of questions that Mr. Sanchez had previously answered at the hearing regarding where he was sitting when he first saw the individual wearing a white jumpsuit at the WCC. The record further reflects that Mr. Sanchez acknowledged that the questions had been asked, Mr. Sanchez answered the questions again, and Pasha sought to admit a two-page excerpt of Mr. Sanchez's prior testimony from the

hearing. However, before seeking to admit the two-page excerpt, Pasha never called Mr. Sanchez's attention to any prior inconsistent statement made by Mr. Sanchez at the hearing. Moreover, Pasha never asked Mr. Sanchez to explain or deny any prior inconsistent statement made by Mr. Sanchez at the hearing regarding where he was sitting when he first saw the individual wearing a white jumpsuit at the WCC. Accordingly, Pasha's argument lacks merit.

### E. Crime Scene Diagram

Pasha argues that the trial court erred in admitting exhibit 156, a cardboard diagram of the crime scene cul-de-sac, over his contemporaneous objection that it was inaccurate. "The admissibility of evidence is within the sound discretion of the trial court, and the trial court's determination will not be disturbed on appellate review absent a clear abuse of that discretion." Gosciminski v. State, 132 So. 3d 678, 697 (Fla. 2013) (quoting Brooks v. State, 918 So. 2d 181, 188 (Fla. 2005)). This Court has long recognized that "a diagram . . . verified as a correct representation of physical objects on the ground about which testimony is offered is admissible in evidence for the use of witnesses in explaining their evidence and to enable the jury to better understand the case." Washington v. State, 98 So. 605, 607 (Fla. 1923).

We find that the trial court did not abuse its discretion in admitting the diagram over Pasha's contemporaneous objection because Deputy Chancey

testified that she had been to the crime scene, verified that the diagram fairly and accurately depicted the crime scene cul-de-sac, and used the diagram to explain her testimony. Pasha claims that the trial court should have granted his renewed objection to the admission of the diagram because, during the subsequent cross-examination of Detective Service, Service conceded that the diagram was not an accurate reflection of the distance between objects. However, the trial court did not abuse its discretion in denying Pasha's renewed objection because the objection addressed an issue of fact—the weight that should be given to the diagram by the jury—rather than the admissibility of the diagram.

Moreover, any error in the admission of a crime scene diagram was harmless for two reasons. First, the State's case was not premised on the distances between objects in the cul-de-sac. Rather, it was based on Pasha's presence at the murder scene, the victims' blood on Pasha's clothes, the victims' blood on the murder weapons, and the bloody murder weapons found in Pasha's van. Second, the jury became aware that the diagram was not to scale through the testimony of Detective Service, aerial photographs of the entire WCC, and individual photographs of the crime scene and evidence. In other words, the jury could not have been misled by the fact that the crime scene diagram was not to scale. Given these circumstances, there is no reasonable possibility that any error in the admission of the crime scene diagram affected the verdict.

## F. Proffers

Pasha argues that the trial court erred when it allegedly excluded evidence and refused to allow Pasha to proffer testimony on twelve occasions. A trial court commits error by refusing to allow a proffer of excluded evidence. See Wood v. State, 654 So. 2d 218, 220 (Fla. 1st DCA 1995) ("[A] trial court commits error if it [excludes evidence and] denies a request to proffer testimony which is reasonably related to the issues at trial."). "[R]efusal to permit a proffer [of excluded evidence] is subject to a harmless error analysis." Fehringer v. State, 976 So. 2d 1218, 1221 (Fla. 4th DCA 2008). However, a trial court does not abuse its discretion when it denies a request to proffer testimony after an objection has been properly sustained on the ground that: (1) the form of a question was improper or (2) a question has been asked and answered. This is because such a denial does not relate to excluded evidence.

The record reflects that the trial court did not refuse to allow a proffer, and Pasha did not make a proffer, in eight of the twelve instances cited by Pasha on appeal. Accordingly, Pasha's claims regarding those eight instances lack merit. The trial court ruled that Pasha could not present a proffer in four of the instances cited by Pasha on appeal. However, as explained below, the trial court did not abuse its discretion in denying those four requests to proffer testimony because the denials did not relate to the exclusion of any evidence.

- 47 -

In the first instance, Pasha asked Detective Service a question regarding the crime scene diagram on cross-examination. Thereafter, the trial court properly sustained the State's objection to the form of the question and Pasha sought an offer of proof. The trial court overruled Pasha's request for an offer of proof but explained that Pasha was welcome to rephrase the question. Pasha declined to rephrase his question and proceeded to a different line of questioning. Although the trial court denied Pasha's request for an offer of proof, it did not err because the denial did not relate to the exclusion of any evidence.

In the second instance, Pasha asked Mr. Sanchez a question on cross-examination regarding the individual Mr. Sanchez had seen covered in blood at the WCC; in the third instance, Pasha asked Mr. Sanchez a question on cross-examination regarding a "shiny object" that the individual purportedly carried; and in the fourth instance, Pasha asked Mr. Sanchez a question on cross-examination regarding where Mr. Sanchez initially saw the individual. In each instance the trial court properly sustained the State's objection to the question as asked and answered, Pasha sought an offer of proof, and the trial court overruled Pasha's request for an offer of proof. Although the trial court denied each of Pasha's requests for an offer of proof, it did not err because none of the denials related to the exclusion of any evidence.

### G. Cumulative Error

Pasha argues that the cumulative effect of these guilt phase evidentiary errors deprived him of his right to a fair trial. "However, where the individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error also necessarily fails." Parker v. State, 904 So. 2d 370, 380 (Fla. 2005). As explained in the analysis of the individual issues above, the alleged errors are either procedurally barred or without merit. Accordingly, we reject Pasha's argument of cumulative error.

## IX. Prosecutor's Comments

### A. Comments Regarding Post-Miranda Silence During the Guilt Phase

Pasha claims that the prosecutor improperly cross-examined him during the guilt phase on his post-Miranda silence in violation of the Fifth Amendment. According to Pasha, this issue is preserved because the trial court granted a motion in limine prior to trial that precluded the State from infringing on Pasha's right to remain silent. However, this issue is not preserved for review because the order granting the motion in limine simply precluded "the State from arguing certain matters in a penalty phase proceeding, including . . . the accused person's right to remain silent." Regardless, we conclude that the prosecutor's questions were not "fairly susceptible of being construed by the jury," State v. Hoggins, 718 So. 2d 761, 769 (Fla. 1998), as commenting on Pasha's exercise of his right to remain silent. The record reflects that Pasha expressly waived his right to remain silent on

the day of the murders by speaking to the police and waived his right to remain silent at trial by taking the stand to testify.

### B.  Comments Regarding Guilt During the Guilt Phase

Pasha argues that the prosecutor improperly asserted personal knowledge of Pasha's guilt while cross-examining him.  However, this issue is not preserved for review because Pasha failed to contemporaneously object to any of the prosecutor's comments or questions during Pasha's cross-examination. Regardless, none of the prosecutor's questions or comments on cross-examination were improper because the prosecutor never expressed his personal belief in or knowledge of Pasha's guilt.  Rather, the prosecutor merely accused Pasha of committing the murders and asked why he did so.

Pasha also argues that the prosecutor improperly asserted personal knowledge of Pasha's guilt in a single comment during closing argument. However, this issue is not preserved for review because Pasha failed to contemporaneously object to the prosecutor's comment.  Regardless, we conclude that the verdict of guilty could have been obtained "without the assistance of the alleged error."  Walls v. State, 926 So. 2d 1156, 1176 (Fla. 2006) (quoting Brown v. State, 124 So. 2d 481, 484 (Fla. 1960)).

### X.  Sufficiency of the Evidence

This Court independently reviews the record in death penalty cases to determine whether sufficient evidence exists to support the conviction. Pham v. State, 70 So. 3d 485, 501 (Fla. 2011). "In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001).

The evidence in this case showed that at approximately 10 p.m. on August 23, 2002, Canady drove to the WCC in her white Buick to pick up her daughter, Singleton, from a training class. Aware of Canady's plan, Pasha drove to the WCC in his white work van. Upon arriving at the WCC, Pasha put on a white jumpsuit and white boots. He then walked to Canady's vehicle, sat in the backseat while Canady remained in the driver's seat, and awaited Singleton's arrival. Pasha was still sitting in the backseat of Canady's vehicle when Singleton entered it.

Deputy Stahlschmidt subsequently found the bodies of Canady and Singleton in the WCC. After obtaining a search warrant, the police discovered a number of items in Pasha's van including a white, bloody jumpsuit and white boots. Inside one of the boots, the police discovered a bloody, broken, 18" to 20" tire thumper. In the other boot, a bloody butcher knife and latex gloves were found. The blood on Pasha, the blood on his clothes, and the blood on evidence

collected from his van matched the blood of one or both victims. The evidence indicated that the victims' wounds resulted from the weapons discovered in Pasha's vehicle. Pasha was seen covered in blood and carrying a shiny object in the WCC, the bodies were still warm when Pasha was leaving the WCC, and Pasha lied about the blood to the police. Accordingly, the circumstantial evidence presented by the State is sufficient to support the murder convictions in this case.

## XI. **Ring and Hurst**

While Pasha's appeal was pending before this Court, the United States Supreme Court issued its decision in Hurst v. Florida in which it held that Florida's former capital sentencing scheme violated the Sixth Amendment because it "required the judge to hold a separate hearing and determine whether sufficient aggravating circumstances existed to justify imposing the death penalty" even though "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." Hurst v. Florida, 136 S. Ct. at 619. On remand in Hurst we held that

> before the trial judge may consider imposing a sentence of death, the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt, unanimously find that the aggravating factors are sufficient to impose death, unanimously find that the aggravating factors outweigh the mitigating circumstances, and unanimously recommend a sentence of death.

Hurst, 202 So. 3d at 57.

In light of the nonunanimous jury recommendation to impose the death sentences, it cannot be said that the failure to require a unanimous verdict as to each death sentence was harmless.  See Franklin v. State, 209 So. 3d 1241, 1248 (Fla. 2016) ("In light of the non-unanimous jury recommendation to impose a death sentence, we reject the State's contention that any Ring- or Hurst v. Florida-related error is harmless.").  We therefore reverse Pasha's death sentences and remand for a new penalty phase.

## CONCLUSION

For the reasons stated above, we affirm Pasha's convictions, vacate Pasha's death sentences, and remand for a new penalty phase.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
CANADY, POLSTON, and LAWSON, JJ., concur as to the conviction and dissent as to the sentence.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Hillsborough County,
    Kimberly Kay Fernandez, Judge - Case No. 292002CF013748000AHC

Howard L. "Rex" Dimmig, II, Public Defender, and Karen M. Kinney, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Scott A. Browne, Senior Assistant Attorney General, Tampa, Florida,

for Appellee